STATE OF NORTH CAROLINA v. ROZELL OXENDINE HUNT

No. 6

(Filed 2 March 1976)

1. Homicide § 21— murder by poisoning — sufficiency of evidence

The State's evidence was sufficient for the jury in a prosecution for first degree murder where it tended to show that defendant, with the intent to kill the victim and pursuant to a preconceived plan to do so, purchased rat poison containing arsenic, that she poured it into tea prepared specially for his consumption and served the tea to him, that the victim drank the tea and almost immediately became ill and died within a few hours, and that the victim's body was exhumed some six months after his death and an autopsy showed the cause of death to be arsenic poisoning.

2. Constitutional Law § 31— right to offer evidence

The trial court did not refuse to allow defendant to put on evidence where the court, in the absence of the jury, informed defendant that, though her counsel had advised that she not put on any evidence, she did not have to follow the advice of her counsel; the probable nature of the testimony of witnesses whom defendant had under consideration was discussed in this conference between the court, defendant and her counsel, and defendant concluded her best chance lay in not calling them to the stand; and defense counsel announced in open court that defendant chose not to put on any evidence. Art. I, § 23 of the N. C. Constitution.

3. Constitutional Law § 29; Jury § 7— prospective jurors — inquiries as to death penalty views

The trial court in a first degree murder case properly permitted the district attorney to question prospective jurors concerning their beliefs with reference to capital punishment.

4. Criminal Law § 163— objections to review of evidence and statement of contentions

Objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires so as to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal.

5. Criminal Law § 113— characterization of victim as common law husband — harmless error

In this homicide prosecution, the trial court's characterization of the victim as the "common law husband" of defendant, if unsupported by evidence and thus erroneous, was harmless beyond a reasonable doubt.

6. Criminal Law § 118— contentions of defendant who offered no evidence

In this homicide prosecution, the trial court did not err in instructing the jury that defendant, who offered no evidence, contended

that the jury ought not to believe what the State's witnesses have said about the matter.

**7. Criminal Law § 73 —statement by deceased — res gestae.**

In this prosecution for first degree murder by poisoning, statement by the victim after he drank allegedly poisoned tea and became ill that he felt like he was poisoned was admissible as part of the *res gestae.*

**8. Homicide § 20— homicide by poisoning — bottles of similar poison — admissibility**

In this prosecution for first degree murder by poisoning, a bottle of rat poison purchased by an SBI agent was properly admitted to illustrate the testimony of a witness as to the kind of bottle of rat poison purchased and used by defendant on the date of the victim's death; furthermore, the court properly admitted into evidence a second bottle of the same kind of rat poison purchased by the SBI agent and testimony by a chemist that the liquid in the bottle contained arsenic.

APPEAL by defendant from *Chess, J.,* at the 10 June 1974 Criminal Session of ANSON.

Under an indictment, proper in form, the defendant was convicted of murder in the first degree and was sentenced to death. The deceased was Joe Hunt, referred to in the judge's charge as her common law husband.

The evidence for the State, the defendant offering none, was to the following effect:

On the morning of 31 August 1973, the defendant, Joe Hunt and Brenda Jacobs, an 18 year old girl who lived with the Hunts, went shopping in Wadesboro. Leaving Joe Hunt in the grocery store, the defendant and Brenda went to the drugstore where Brenda saw the defendant purchase a small bottle of liquid rat poison, which the defendant put in her pocket.

Upon their return to their home, Joe Hunt went into the garden to gather okra for lunch. While he was out of the house, Brenda, in another room, looked through the door into the kitchen and saw the defendant pour half of the bottle of rat poison into a jug of tea specially prepared for Joe Hunt and put the jug in the refrigerator. Two jugs of tea were prepared, the one used for Joe Hunt's tea being identified by a dent in its side.

Lunch was then prepared and the defendant served Joe Hunt tea from the jug into which she had poured the poison. Brenda drank her tea from the other jug. The defendant drank

none. Joe Hunt drank a substantial quantity of the poisoned tea. Prior to doing so he was in good health.

After lunch they all lay down for a rest and then got up and went to the tobacco pack house to work in their tobacco. Joe Hunt became ill and vomited several times, saying he felt like he was poisoned. During the afternoon and through the night his condition grew worse. His hands and toes drew up in knots. The defendant made no attempt to help him. Early the following morning, he was carried to the hospital in Wadesboro and, the doctor in charge being unable to determine the nature of his illness, he was transferred to a hospital in Charlotte where he died that day, the day following his drinking of the poisoned tea. He was buried in Rowland, Robeson County.

Brenda observed Joe Hunt's body in the casket prior to the funeral and testified that the State's Exhibit No. 1, a photograph, fairly portrayed the appearance of his body prior to burial. This photograph was placed in evidence to illustrate Brenda's testimony. She described the rat poison, so purchased and used by the defendant, as a white liquid and the bottle in which it was contained as bearing the picture of a "skeleton" and red lettering. She did not know what became of that bottle. Upon being shown a bottle of Singletary's rat poison, introduced in evidence to illustrate her testimony, and purchased by police officers at the above mentioned drugstore, Brenda said it was the same kind of bottle, the same size and color, and bearing the same markings as the bottle which she saw the defendant purchase and from which she saw the defendant pour a liquid into the tea prepared for and drunk by Joe Hunt. Singletary's rat poison contains a large proportion of arsenic.

Prior to this occasion, the defendant told Brenda she, the defendant, had tried to kill Joe Hunt by poison on more than one occasion but it "looked like every time she tried to kill Joe that God had made a way for him to live," and Joe Hunt "was a hard man to kill."

Some six months after the death of Joe Hunt, Brenda made a statement to agents of the State Bureau of Investigation concerning the above narrated events, which statement was introduced in evidence to corroborate her testimony, it being substantially the same as her testimony. Following the making of this statement by Brenda, the body of Joe Hunt was exhumed from the grave in Rowland and an autopsy was performed on

17 April 1974. A photograph of the body taken when it was exhumed and the casket opened and another photograph taken at the time of the autopsy were introduced in evidence to illustrate the testimony of Agent Hawley of the State Bureau of Investigation, who was present at the exhumation and at the autopsy and to illustrate the testimony of the medical examiner who performed the autopsy. Each of these witnesses testified that these respective photographs correctly represented the appearance of the body so exhumed and upon which the autopsy was so performed. The three photographs of the body, before burial, after exhumation and at the autopsy, were exhibited to the jury. The body was then returned to the same grave in the Rowland cemetery.

In the course of the autopsy, the liver was examined and the presence therein of 3.4 mg per cent arsenic was ascertained, the normal arsenic range in the human liver being 0.001-0.01 mg per cent. In the opinion of the Chief Medical Examiner of the State, who performed the autopsy, Joe Hunt died of arsenic poisoning.

The State having rested its case, the defendant, through her court-appointed counsel, elected not to introduce any evidence. Thereupon, the defendant and her counsel retired from the courtroom for a conference. Upon their return to the courtroom, the trial judge, out of the hearing of the jury, inquired of the defendant as to whether she had discussed the matter with her counsel. She replied that she had done so and said, "I have witnesses I want to testify." The court further inquired as to whether she would put on evidence, stating to the defendant that her counsel advised that she not do so. The defendant replied, "I don't want to put none on either but I have witnesses." The court then advised the defendant that she did not have to follow the advice of her counsel if she did not wish to and then said, "With that knowledge, do you wish to voluntarily instruct your attorney you do not wish to put on any evidence?" To that the defendant replied, "No, Sir, 'cause I ain't got none to put on." The defendant's counsel then stated that the defense chose not to put on any evidence and rested, renewing his motion for a judgment of nonsuit, which motion was denied.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Charles J. Murray for the State.*

*Henry T. Drake for defendant.*

LAKE, Justice.

The defendant's motions for a directed verdict and for a judgment of nonsuit are the same in legal effect and the test of the sufficiency of the evidence to withstand each such motion is the same. *State v. Glover,* 270 N.C. 319, 154 S.E. 2d 305 (1967) ; G.S. 15-173. It is well established that in considering such a motion the evidence for the State must be deemed to be true and must be considered in the light most favorable to it, the State being entitled to the benefit of all inferences in its favor which may reasonably be drawn therefrom. *State v. Price,* 280 N.C. 154, 184 S.E. 2d 366 (1971) ; *State v. Roseman,* 279 N.C. 573, 184 S.E. 2d 289 (1971) ; *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967) ; *State v. Bruton,* 264 N.C. 488, 142 S.E. 2d 169 (1965). All of the evidence actually admitted, whether competent or incompetent, which is favorable to the State, must be taken into account and must be so considered by the court in ruling upon the motion. *State v. Cutler, supra; State v. Walker,* 266 N.C. 269, 145 S.E. 2d 833 (1965) ; *State v. Virgil,* 263 N.C. 73, 138 S.E. 2d 777 (1964). The motion should be denied when, upon such consideration of the evidence, there is substantial evidence to support a finding that an offense charged in the bill of indictment has been committed and the defendant committed it. Strong, N. C. Index 2d, Criminal Law, §§ 104, 106.

[1] The evidence in the present case, so considered, is ample to support findings that the defendant, with intent to kill Joe Hunt and pursuant to a preconceived plan to do so, purchased rat poison containing arsenic, that she poured it into tea prepared specially for his consumption and served the tea to him, that Joe Hunt drank the tea into which the defendant had poured such poison, and that he, almost immediately, became ill and died within a few hours, the cause of his death being arsenic poison. "A murder which shall be perpetrated by means of poison * * * shall be deemed to be murder in the first degree and shall be punished with death." G.S. 14-17.

There is no merit whatever in the contention of the defendant that the evidence is not sufficient to support a finding that the Joe Hunt, whose body was exhumed and found to contain arsenic poisoning in sufficient quantity to cause death, and which did cause his death, was the same Joe Hunt whose tea was prepared, poisoned and served to him by the defendant. The testimony of Brenda Jacobs was that the Joe Hunt so

poisoned by the defendant died and was buried in Rowland, Robeson County, and that the State's Exhibit 1 is a photograph fairly and accurately representing the appearance of his body as it lay in the casket prior to burial. The testimony of Ronald Hawley, agent of the State Bureau of Investigation, is that he was present when the body of Joe Hunt was exhumed from the grave in Rowland and when the casket was opened and that the State's Exhibit 4 is a photograph correctly portraying the appearance of the body of Joe Hunt when the casket was first opened. The testimony of Dr. Page Hudson, Chief Medical Examiner of North Carolina, is that he performed the autopsy upon the body brought to his office by Agent Hawley, which body was identified by Agent Hawley as that of Joseph Hunt, and that the State's Exhibit 5 is a photograph of the body so brought to him, and that this body contained arsenic poisoning, which poisoning was, in the opinion of Dr. Hudson, the cause of death. The three photographs were properly exhibited to the jury and formed a sufficient basis to support its conclusion that the body upon which the autopsy was performed was the body of the man to whom the defendant so administered poison. The record does not indicate the slightest suggestion by the defendant at the trial to the contrary. The motion for judgment of nonsuit and the motion for a directed verdict of not guilty were properly overruled.

[2] Obviously, the defendant was entitled to offer evidence in her defense at the trial, either through her own testimony or through the testimony of other witnesses. Constitution of North Carolina, Art. I, § 23. Of course, she would have been entitled to a new trial had the court, as the defendant asserts in her brief, refused to allow the defendant to put on evidence. There is, however, no merit in this contention for the reason that the record clearly shows the contrary.

At the conclusion of the State's presentation of the evidence, the trial judge asked if there were any evidence for the defendant. Defendant's trial counsel replied, "No, Sir." Thereupon, the defendant and her counsel retired from the courtroom for a conference and upon their return, the trial judge, out of the presence of the jury, conferred with the defendant and her counsel. The record shows clearly that the court informed the defendant that, though her counsel had advised that she not put on any evidence, she did not have to follow the advice of her counsel. The record indicates that in this conference between

the court, the defendant and her counsel, the probable nature of the testimony of witnesses whom the defendant had under consideration was discussed and the defendant concluded her best chance lay in not calling them to the stand. Thereupon, her counsel announced in open court that the defendant chose not to put on any evidence. This assignment of error is overruled.

[3] There was no error in the trial court's permitting the District Attorney to question prospective jurors concerning their beliefs with reference to capital punishment. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968); *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974). In the Crowder case, we said, "In order to insure a fair trial before an unbiased jury, it is entirely proper in a capital case for both the State and the defendant to make appropriate inquiry concerning a prospective juror's moral or religious scruples, beliefs, and attitudes toward capital punishment." Furthermore, the record discloses that no juror was challenged for cause by reason of his or her views on the subject of capital punishment. The record indicates that only three jurors were challenged by the State, all of them peremptorily. This assignment of error is without merit.

[4] The defendant's Assignments of Error 12, 13 and 14 are without merit. These relate to alleged errors by the court in the court's review of the evidence and of the contentions of the defendant, inherent in her plea of not guilty, in the court's charge to the jury. As to these assignments of error, it is sufficient to note that there is no indication in the record that any of the alleged inaccuracies was called to the attention of the court before the jury retired. The law requires that this be done in order to give the trial judge an opportunity to correct any alleged inaccuracy in his review of the evidence and statement of the contentions of the parties. In *State v. Virgil,* 276 N.C. 217, 230, 172 S.E. 2d 28 (1970), this Court, speaking through Justice Huskins, said, "[I]t is the general rule that objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires so as to afford the trial judge an opportunity for correction, otherwise they are deemed to have been waived and will not be considered on appeal." In support of this principle, see the following cases there cited: *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968); *State v. Butler,* 269 N.C. 733, 153 S.E. 2d 477 (1967); *State v. Case,* 253 N.C. 130, 116 S.E. 2d

429 (1960); *State v. Rhodes,* 252 N.C. 438, 113 S.E. 2d 917 (1960); *State v. Holder,* 252 N.C. 121, 113 S.E. 2d 15 (1960); *State v. Shumaker,* 251 N.C. 678, 111 S.E. 2d 878 (1960); *State v. Grundler,* 251 N.C. 177, 111 S.E. 2d 1 (1959); *State v. Moore,* 247 N.C. 368, 101 S.E. 2d 26 (1957); *State v. Saunders,* 245 N.C. 338, 95 S.E. 2d 876 (1957).

[5] We have, however, carefully reviewed this portion of the judge's charge to the jury and we find therein no significant inaccuracy. It is true that the court in its review of the evidence referred to Joseph Hunt as the "common law husband" of the defendant, whereas the record on appeal does not disclose their relationship except that they were living together with Brenda Jacobs, "Gene Lindsey * * * and all of Rozell's and Joe's children" in a five room house. The defendant's counsel on appeal was not her trial counsel. Like us, his knowledge of what occurred at the trial is limited to the printed record. Whether the trial judge's understanding of the relationship between the defendant and the deceased had basis in some reference thereto in the presence of the jury at the trial, we are unable to determine. It is, however, clear that his characterization of it in the charge evoked no objection from the defendant's trial counsel and, apparently, he did not deem the judge's statement prejudicial.

If there was no evidence to support it, the judge's characterization of the relationship in his charge was, of course, error, but, in view of the evidence in the record, we think it inconceivable that a different verdict would have been reached had the judge merely referred to the deceased as the husband of the defendant. The error, if any, was clearly harmless. New trials are not given, even in capital cases, where there is no reasonable basis for supposing that, but for the error, a different result would have been reached. *State v. Bryant,* 283 N.C. 227, 195 S.E. 2d 509 (1973); *State v. Fletcher and Arnold,* 279 N.C. 85, 100, 181 S.E. 2d 405 (1971); *State v. Paige,* 272 N.C. 417, 424, 158 S.E. 2d 522 (1968); *State v. Rainey,* 236 N.C. 738, 74 S.E. 2d 39 (1953).

[6] After reviewing the evidence and stating the contentions of the State, the court instructed the jury, "On the other hand the defendant says and contends that you ought not to find her guilty from all the evidence in the case, and that you ought not to believe what the State's witnesses have said about it, and at the very least you should have a reasonable doubt in your

mind as to her guilt, and that you ought to find her not guilty." At the time, no objection was interposed to this statement of the contentions of the defendant by her trial counsel. In this Court, she contends that it was error for the trial judge to instruct the jury that the defendant contended that the jury ought not to believe what the State's witnesses have said about the matter, the defendant not having testified at all. As Justice Huskins, speaking for this Court, said in *State v. Lee,* 277 N.C. 205, 176 S.E. 2d 765 (1970) : "Upon his plea of not guilty Lee could hardly contend otherwise than that the testimony of the State's witnesses should not be believed. He could not very well contend that their testimony represented the truth of the matter. For the judge to so charge is no distortion of the defendant's position. While the able and patient judge in this instance might well have stated no contentions at all on Lee's behalf and rested on a single explanation of the effect of Lee's plea of not guilty, his attempt to give a logical contention for Lee in face of the overwhelming evidence of guilt will not be held for error."

The defendant's Assignments of Error 3, 5, 8 and 9 relate to the admission of evidence.

[7] Brenda Jacobs testified that before she, the defendant and Joe Hunt left the house, after the noon meal at which he drank the allegedly poisoned tea, Joe Hunt became ill and after reaching the pack house vomited on two occasions and said he felt like he was poisoned. The defendant moved to strike the testimony as to this statement by Joe Hunt. She now assigns the overruling of this motion as error.

Quite obviously, the statement by Joe Hunt could not be admitted on the theory that it was a dying declaration, since there is nothing to indicate that Joe Hunt apprehended that he was in danger of death. Stansbury, North Carolina Evidence (Brandis Revision), § 146. However, the statement was clearly admissible as part of the *res gestae.* As stated in Stansbury, North Carolina Evidence (Brandis Revision), §§ 158 and 161: "[T]he *res gestae* phrase is used to describe situations in which words accompany and are connected with non-verbal conduct or external events, and carries the general idea of something said while something is happening or is being done. * * * [A] person's statements as to his own *then existing* pain or other physical discomfort * * * are admissible whenever such mental or physical condition is relevant and the evidence is not subject to exclusion because of some other rule." *Munden v. Insurance*

*Co.* 213 N.C. 504, 196 S.E. 872 (1938) ; *State v. Jeffreys,* 192 N.C. 318, 135 S.E. 32 (1926) ; *State v. Harris,* 63 N.C. 1 (1868). There was no error in the denial of the motion to strike the testimony of Brenda Jacobs concerning this statement by the deceased.

[8]    Likewise, we find no error in permitting the State to introduce in evidence Exhibits 3 and 7, two bottles of Singletary's Rat Poison, and evidence as to the arsenic content in the liquid contained in Exhibit 7. The death of the deceased by poison was, apparently, not suspected by the authorities until Brenda Jacobs made a statement to an agent of the State Bureau of Investigation six months after the alleged crime. An agent of the Bureau then purchased from the drugstore of Charles Kiser, in Wadesboro, the two bottles, Exhibits 3 and 7, which Mr. Kiser, who sold them to the agent, testified were Singletary's Rat Poison, and that on 31 August 1973, the date of the alleged purchase of rat poison by the defendant, he, Mr. Kiser, carried in stock "Singletary's Rat Poison of the same kind as is now contained in State's Exhibits 3 and 7." Brenda Jacobs, on recall, testified this was the same druggist from whom she saw the defendant purchase the bottle of rat poison on 31 August 1973.

Brenda Jacobs testified that after she observed the defendant pouring half of the contents of the bottle of rat poison purchased by the defendant into the tea prepared for consumption by Joe Hunt, she, Brenda Jacobs, never saw that bottle again and did not know what the defendant did with it. After examining State's Exhibit 3, front and back, she testified, "It is the same poison Rozell bought," the same kind of poison, the same kind of bottle and the same kind of markings thereon. Thereupon, the court admitted Exhibit 3 into evidence to illustrate the testimony of Brenda Jacobs as to "the kind, size and color of the bottle of rat poison," if the jury found that it did so illustrate her testimony. On cross-examination, Brenda Jacobs testified that she did not know the name of the rat poison so purchased by the defendant but Exhibit 3 bore the same kind of writing that was on the bottle so purchased by the defendant and she remembered "that red writing on it and * * * the skeleton head." Brenda Jacobs had previously testified that the substance poured by the defendant into the tea, prepared by the defendant for consumption by Joe Hunt, was "white liquid rat poison, the same rat poison she bought that morning."

We find no error in the admission in evidence of the State's Exhibit 3 to illustrate the testimony of Brenda Jacobs as to the kind of bottle so purchased and used by the defendant on 31 August 1973. The testimony of Brenda Jacobs sufficiently accounts for the inability of the State to offer in evidence the bottle actually used by the defendant six months before the alleged crime was brought to the attention of the police officers.

The record discloses no objection by the defendant to any of the testimony by Brenda Jacobs concerning the similarity in appearance of the State's Exhibit 3 and the bottle so purchased and used by the defendant on 31 August 1973, nor does it show any objection by the defendant to the introduction of State's Exhibit 3 into evidence or to the handing of it to the jury for their inspection. Consequently, had there been error in the admission of this evidence, the defendant waived it. *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534 (1970); *State v. McKethan,* 269 N.C. 81, 152 S.E. 2d 341 (1967); Stansbury, North Carolina Evidence (Brandis Revision), § 27.

There was, likewise, no objection interposed to the testimony of Dr. Arthur McBay, Chief Toxicologist in the office of the Chief Medical Examiner of the State, to the effect that on previous occasions he had analyzed bottles of Singletary's Rat Poison and had found it contained three and one-half per cent arsenic trioxide, such bottles bearing labels identical to those on the State's Exhibit 3. Again, there was no objection to the the testimony by McBay that the State's Exhibits 3 and 7 contained a white sediment, which, in his opinion, was "probably the arsenic trioxide which is described on the label," the liquid in the bottle being incapable of holding in solution any more of this substance. R. D. Cone, a chemist for the State Bureau of Investigation, testified, without objection, that he made an analysis of the liquid contained in the State's Exhibit 7 and found the solution in that bottle to contain arsenic. At the conclusion of the testimony of this witness, the State's Exhibit 7 was offered in evidence and admitted over the defendant's objection. We find no merit in the defendant's assignments of error relating to the admission in evidence of the State's Exhibits 3 and 7 and the testimony relating thereto.

Other assignments of error made by the defendant in the statement of her case on appeal are not brought forward into her brief and no argument or citation of authority in support thereof appears therein. These assignments are, therefore,

deemed abandoned. Rule 28, Rules of Practice in the Supreme Court (old rules). See also, Rule 28(a), Rules of Appellate Procedure (new rules), 287 N.C. 671, 741.

In fairness to counsel appointed to represent the defendant on her appeal to this Court, it is to be observed that he was not her counsel at the trial. He has properly combed the record in search of an error sufficient to justify the granting of a new trial and has presented to this Court the matters hereinabove discussed. Because of the seriousness of the offense charged and the sentence of death imposed, we have carefully examined the entire record and all of the assignments of error, including those abandoned. The evidence in the record, if true, as the jury found it to be, discloses a coldly calculated and executed murder by poison. The statute of this State, G.S. 14-17, declares that such a murder "shall be deemed to be murder in the first degree and shall be punished with death." The judgment of the Superior Court is in accord with the statute and the record discloses no error in the trial of the defendant which would justify the granting of a new trial.

No error.