STATE OF NORTH CAROLINA v. RICHARD E. HOUSE

No. 12

(Filed 6 June 1978)

1. **Indictment and Warrant § 5— true bill—foreman's attestation of concurrence by twelve grand jurors—directory provision**

   A bill of indictment was not invalid because it contained no attestation by the foreman of the grand jury that twelve or more grand jurors concurred in the finding of a true bill in compliance with G.S. 15A-644(5) since the foreman's signature on the indictment attesting that the grand jury found the indictment to be a true bill necessarily attested the concurrence of at least twelve of its members in this finding.

2. **Constitutional Law § 45; Criminal Law § 87; Jury § 6— defendant represented by counsel—no right to question jurors and witnesses personally**

   The trial court did not err in denying defendant's request that he, personally, be permitted to question prospective jurors on voir dire and witnesses at the trial in addition to questions propounded by his counsel, since no one has the right to appear both by himself and by counsel.

3. **Criminal Law § 102— opening statement in propria persona—defendant represented by counsel**

The defendant, while retaining the services of his court-appointed counsel, was not entitled to make an opening statement to the jury *in propria persona*.

4. **Constitutional Law § 68— court's refusal to subpoena witnesses**

The trial court did not err in refusing, after the State had rested, to direct the issuance of subpoenas for persons whom the defendant said he wished to call as witnesses where the court ascertained that the testimony which defendant hoped to elicit from the proposed witnesses would not have been material in the trial of defendant, and no reason was suggested for defendant's failure to subpoena the proposed witnesses prior to the trial.

5. **Constitutional Law § 68— refusal to permit defendant to present subpoenaed witnesses—denial of right of confrontation—harmless error**

The trial court in a prosecution for first degree murder erred in refusing to permit defendant, who waived his right to counsel and appeared *in propria persona*, to put certain subpoenaed witnesses on the stand after the court determined in the absence of the jury that the testimony of the witnesses would be detrimental to defendant, since the defendant was entitled to use his own judgment as to the wisdom of introducing otherwise competent evidence, and the denial of that right violated defendant's right of confrontation afforded by the Sixth Amendment of the U.S. Constitution and Article I, § 23 of the N.C. Constitution. However, such error was harmless beyond a reasonable doubt where the record shows that none of these witnesses would have testified to any matter conceivably beneficial to the defendant.

6. **Constitutional Law §§ 45, 49— defendant's representation of self—written waiver of counsel not required**

The trial court did not err in permitting defendant to represent himself in his murder trial without executing a written waiver of his right to counsel when, during the trial, defendant informed the court that he wished to discharge his court-appointed counsel and to represent himself, and the court, upon proper inquiry, determined that defendant did desire to represent himself notwithstanding the court's advising him that he would be subject to the same rules of evidence applicable to defendants represented by counsel.

7. **Constitutional Law § 48— failure to appoint trial counsel for appeal—motion by defendant**

The trial court did not err in failing to appoint defendant's court-appointed trial counsel to represent him on appeal where defendant, himself, made a motion at the end of his trial that another lawyer be appointed to represent him on appeal.

APPEAL by defendant from *David Smith, J.*, at the 5 July 1977 Criminal Session of GRANVILLE.

The defendant having been found guilty of murder in the first degree was sentenced to imprisonment for life. The evidence for the State, if true, was sufficient to show:

During the morning of 22 December 1976, the defendant was released from jail. He reached his trailer home shortly after noon that day. There he met his wife, her sister and his father, walking from the trailer toward their car. All four went back into the trailer.

Almost immediately thereafter, the defendant's wife ran out and hid behind the trailer of their next door neighbor. The defendant was observed standing beside his trailer holding a shotgun. He then disappeared around the front of his trailer and came back empty handed. Thereupon, he and his wife had some conversation, inaudible to the witness, and she went with him to the front of the trailer and apparently they entered it.

A few minutes later, a neighbor heard a gunshot and, looking out, saw the defendant's wife fall to the ground outside the back door of the defendant's trailer. As she lay on the ground, crying out, "I am dying," the defendant, standing over her, with a shotgun in his hand, fired a second shot into her back, killing her instantly. He then took the gun to the back door of the trailer, threw it into the trailer, went to his car and left. He was arrested in Durham later in the afternoon. An autopsy revealed that the cause of death was the shotgun wound in the back, the deceased also having shotgun pellet wounds in her right leg.

The cause of the quarrel at the time of the shooting was the defendant's resentment of his wife's failure to come down to the jail to see him the previous night. As she fled out the back door, the second time she ran from the trailer, the defendant fired the gun out the back door in the direction in which she was running. There was a large hole through the lower portion of the door, apparently caused by a shotgun blast. The condition of the fatal wound in the back of the deceased was such that, in the opinion of the Chief Medical Examiner for the State, who performed the autopsy, the shot

was fired while the gun was pointed at right angles to the body and at a distance from it of at least two feet and not more than four feet. There were no fingerprints upon the barrel of the shotgun, which is not unusual by reason of a gun's having an oily surface.

Some three months prior to trial, the defendant, through his court-appointed counsel, appeared in court and orally moved that the bill of indictment be dismissed, for the reason that it contained no attestation by the foreman that twelve or more members of the grand jury had concurred in the finding of it to be a true bill. This motion was denied by the judge then presiding. The indictment, otherwise, proper in form, was signed by the solicitor, stated the names of witnesses for the State, including those examined by the grand jury, and stated, over the signature of the foreman:

"Those [witnesses] marked X sworn by the undersigned foreman, and examined before the Grand Jury, and this bill found 2-7-77 A True Bill."

When the case was called for trial, some three months later, the defendant, present in court with his court-appointed counsel, requested the court to permit him, in person, to interrogate the prospective jurors on voir dire, in addition to questions propounded to them by his court-appointed counsel. He also requested permission of the court to make an opening statement to the jury and that he be permitted, in person, to examine witnesses. These requests were denied by the trial judge who informed the defendant that if, at the conclusion of examination of prospective jurors by the attorneys, the defendant wanted further questions asked, he might submit them to the court through his court-appointed counsel and the court, if the questions were proper, would permit counsel to ask them. The trial judge advised the defendant that the same procedure would be followed in the examination of witnesses. He also advised the defendant that he was not entitled to make an opening statement to the jury unless the court, in its discretion, so permitted, and that neither the State nor the defendant would be permitted to make such statement.

Following the selection and impaneling of the jury, the defendant, in the absence of the jury, indicated a qualified dissatisfaction with his court-appointed counsel. Thereupon, the

court advised the defendant that he had the right to defend himself if he so desired and, if so, the court would dismiss his court-appointed counsel but would not assign another counsel to represent him. The defendant then stated that he would proceed with his court-appointed counsel.

During the cross-examination of the State's principal witness, the first witness called to the stand, the defendant, in the absence of the jury, advised the court that he wanted to discharge his counsel and represent himself. The court thereupon advised the defendant that if he took this course, he would be subject to the same rules of evidence as if he had an attorney representing him and the court would not undertake to advise him on any of the rules of evidence during the trial. The defendant advised the court that he understood this and, thereupon, the court, finding that the defendant had knowingly and intelligently waived his right to counsel and had moved the court that he be able to defend himself without the assistance of counsel, discharged the court-appointed counsel but directed him to remain in the courtroom throughout the trial and to be available to the defendant for legal advice, which the counsel did.

The jury was then recalled to the courtroom and advised of the defendant's election to represent himself. The trial proceeded with the defendant acting as his own counsel. The record discloses that, at the time of the trial, the defendant was 35 years of age, had progressed to the Ninth Grade in school and had an I.Q. above normal. It also discloses that he was an habitual drunkard and had served one or more prison sentences for offenses not disclosed.

The defendant then presented to the court a list of witnesses he wished subpoenaed in addition to those who had already been subpoenaed by his court-appointed counsel. Such subpoenas were issued.

The trial then proceeded in a somewhat confused manner due to defendant's lack of expertise in trial procedure. It was interspersed with several motions by the defendant for a mistrial due to the court's rulings upon evidentiary matters, all of which motions were overruled. These and other incidents necessitated frequent voir dires and discussions between the court and the defendant, all of which were conducted in the absence of the jury.

The following example of such motions and discussions occurred during the presentation of the State's evidence:

"THE COURT: All right, Mr. House, do you have a motion?

DEFENDANT HOUSE: Yes, sir. I make a motion for a mistrial; that the trail [sic] be declared on the grounds that 90 percent of my questions as to the truth of what happened on this fateful day have been overruled, but the prosecution questions regardless of how many have never been overruled. This shows prejudice to a fair trial for me. It seems the truth on my side is being suppressed on the expediency of this trial."

None of the questions to which this statement relates are set forth in the record on appeal.

Before beginning the introduction of his own evidence, the defendant once more moved for a mistrial, saying, in the absence of the jury:

"DEFENDANT HOUSE: I protest the constitutional rights even though I choose to defend myself by telling and asking questions that I was refused a lawyer to guide me in the tricks of the lawyer of the legal trade to help in legal procedure to the truth of the crime. I am uneducated, indigent, so therefore, unable to act with the detriment [sic] of the court out of ignorance."

The court replied that the defendant had a standby attorney, whom he could consult at any time, and denied the motion.

Defendant then moved for a mistrial because the jury was not permitted to hear this protest and motions for a mistrial, leaving these matters to be decided only by the judge. The court denied this motion, explaining to the defendant that such motions were for determination by the court alone, presenting questions of law with which the jury was not concerned.

It appears from the record, including the defendant's somewhat confused and incoherent arguments to the trial court, that the defendant's theory of defense was that he, having been often hospitalized for acute alcoholism, was, at the time of the shooting of his wife, emotionally disturbed by reason of his belief that his wife had been unfaithful to him and that he was not the

father of one or more of the children ostensibly born of the marriage, and that he did not intend to shoot her, the fatal shot having been accidentally fired when his wife, lying wounded on the ground, reached up and grabbed the barrel of the gun so that it discharged when he tried to jerk it from her grasp, the first shot having been fired by him to stop her from running from the trailer but not to injure her. The record contains no evidence of unfaithfulness by the deceased to the defendant except by his own assertions relating to several years prior to the shooting.

Witnesses called by the defendant testified before the jury to the following effect:

For several months prior to the shooting of the deceased, the defendant had consultations with a representative of the County Alcoholism Program, who found him to be a man with "a very explosive type personality" and whose temper had "a very low threshold," but who was "capable of distinguishing right from wrong." He was released from jail on 22 December, the day of the shooting, so that he could go home for Christmas.

Dr. Royal, of the staff of Dorothea Dix Hospital, to which the defendant was sent for a mental examination following his arrest upon the charge of killing his wife, testified that, as a result of such examination, he was of the opinion that the defendant was able to determine right from wrong, was mentally capable of proceeding to trial on the charge in question, did not suffer from delusions or hallucinations, had generally adequate memory and intelligence, but had a problem with depression and alcoholism.

Two men, previously strangers to the defendant, testified that they gave him a ride from a poolroom to his trailer home, that he and they had drunk some beer but, upon arrival at his home, the defendant did not seem angry but was appreciative of the ride and thanked them. When he got out of the car they drove away immediately. In their opinion, he was not then intoxicated and acted normally.

The defendant, himself, testified to the following effect:

When he was released from the penitentiary in 1965, he returned to his home and determined that his wife was preg-

nant with another man's child. He then assaulted her "very bad" but then he "cooled off" and told her he would try to live with that situation. When he went to work, she took the two children and left for home. Again, in 1968, while he was in prison for another offense, she "took up with another man." She divorced the defendant while he was in the penitentiary but upon his release she came back to him and they "started making another go at it." It seemed that one of the other of them was "doing something all the time to agitate one another." He then began drinking in 1969 and was hospitalized numerous times for that reason. He learned then that if he drank any more he would die and he quit drinking for approximately a year but, in 1976, began drinking again. As a result, he lost his job.

He was arrested on 14 December 1976 (eight days prior to the shooting) and while in jail his wife visited him and told him she had attended a dance to have "a little fun." When he told her that all he wanted was to be at home for Christmas she laughed.

When he returned home, following his release from jail the morning of December 22, his wife, her sister and his father were leaving and he told her he would like to talk to her. They went into the trailer. They began to quarrel about her having been to the dance. She ran out the front door so he went into the bedroom and got the shotgun, went out of the house and observed his wife standing behind a neighbor's trailer. He called her and told her, "You better come back in the house and listen to what I got to say." She having stated she was afraid of him with the gun, he went back to the front of the trailer and handed the gun to his sister-in-law and then said to his wife, "Look, all I want to do is talk to you." Thereupon, she came back into the trailer.

The quarrel resumed and he slapped her and threw her to the floor. Upon her promise to "be good," he let her get up, telling her that their problems had to be worked out for the sake of the children. She then ran out the back door of the trailer, whereupon he "saw red." He got the shotgun and loaded it. Seeing a "flash" of her as she ran past the back door, he shot through the door, "thinking that would scare her to stop and stand still."

Going out the door, he observed her lying on the ground and asked her if she was hurt. She replied that she was shot in the leg. He walked up to her with the gun pointed away from her and asked how badly was she hurt. In a few seconds she raised up and grabbed the gun, shouting, "He's going to kill me." He jerked the gun from her grasp and, as he did so, it fired. He then ran into the trailer, threw the gun down, went back out to the car and left in a state of shock.

When he arrived at home following his release from the jail, he had drunk "approximately seven beers" but was not drunk. He knew what he was doing and he was "in the right frame of mind."

The defendant called as his witness his brother-in-law, Billy McGhee, who testified that he had known the defendant's wife since she was a child and knew nothing about her going with anyone else. In response to questions by the court, this witness said that he knew nothing whatever about the circumstances surrounding the shooting or about the mental or physical condition of the defendant. Though the record does not clearly so indicate, this questioning by the court seems to have been at the apparent conclusion of the defendant's direct examination of this witness. There being no cross-examination by the State, the court told the witness he could "step down and be excused." Thereupon, the defendant said, "I am not finished with this witness." The court instructed him to call his next witness.

Four witnesses, subpoenaed at the request of the defendant, were then examined by the court on voir dire, in absence of the jury. On such voir dire examinations, one of these testified that he did not become acquainted with the defendant until more than two months after the shooting. Another, whom the defendant advised the court was called for the purpose of showing that his wife had dated other men and had children by them, testified that he had not seen the defendant since the defendant's arrest eight days prior to the shooting, that all he knew about the defendant's mental or physical condition was that the defendant was "just mean," and that, if asked to testify as to his good character and reputation, he could not say anything good about him. The third of these prospective witnesses was the mother of the deceased who testified on voir dire that she was not present at the time of

the shooting and, if asked to testify concerning the defendant's good character and reputation, she would testify that he had "a bad character, absolutely bad." The fourth of these prospective witnesses testified that she did not know the defendant but knew of him, that every time she had seen him "he was drunk," that she did not know "a thing about the shooting," and, if asked to testify to the defendant's good character, she would testify, "He's got a bad character" and he "did have a good wife."

At the conclusion of these voir dires, the court ruled that the testimony of these witnesses would be adverse to the defendant's interests, that they could shed no light on the shooting, knowing nothing about it, and that they would all testify to the bad character and reputation of the defendant, so that to permit them to testify would be detrimental to his defense. Consequently, the court ruled that these witnesses would not be permitted to testify and released them from the subpoenas. The defendant protested this ruling as "suppressing the truth," saying that what he wanted to develop from these witnesses was that they were all hostile to him and what they were saying were "absolutely lies."

Similarly, the court, upon a voir dire in the absence of the jury, determined that another of the defendant's proposed witnesses, James Hudson, by whom the defendant proposed to show his wife's misconduct, had never seen the defendant's wife at a dance with anyone else, had never told the defendant he had so seen her and the only time he had ever seen her was when he was sent by the defendant to the defendant's home to get some clothing, the defendant being in jail. This witness would also be unable to testify to the defendant's good character and reputation. Over the defendant's protest, the court ruled that this witness could not be called to the stand, since his testimony could not be beneficial to the defendant and might be detrimental to him, and released the witness from the subpoena. The defendant protested, saying, "I'd like to ask this man to be charged with perjury."

Again, the defendant's sister-in-law, who was present at the defendant's trailer at the time of the shooting, was subpoenaed as a witness for the defendant. On voir dire, in the absence of the jury, she testified concerning the quarrel preceding the shooting, saying that, following the wife's return to the trailer, the wife

begged the defendant not to shoot her and that was all this witness knew about the occurrence. The court thereupon said that the testimony of this witness "would be highly prejudicial to the defendant's defense and in the interest of justice" ruled that the witness could not testify before the jury.

The defendant requested subpoenas for Nelson Blackwell, James Earl Ray, the editor of the Oxford newspaper, and the pastor of a church, presumably one which the defendant attended. Upon inquiry by the court, in the absence of the jury, the defendant stated that he expected to show through Blackwell that Blackwell was the father of one of the defendant's ostensible children, the child being 11 years of age at the time of the shooting; that he expected to show through Ray that he had "shacked up with" the defendant's wife some 10 years prior to the shooting; that he expected to show by the editor of the newspaper that the editor had published a story which was "prefabricated" and the defendant desired to examine this witness to show to the jury where and how he got this information and "why he didn't check this information out before he put this publicity into the public." The court ruled in each of these instances that the motion to subpoena the proposed witness was denied. As to the pastor of the church, the defendant stated that he proposed to use him as a character witness with reference to the defendant's mode of life from 1975 to 1976. The court denied the motion to subpoena this witness.

Upon the return of the verdict and the imposition of sentence, the defendant gave notice of appeal and, with the consent of his previously court-appointed counsel, requested that "another lawyer be appointed" to represent him on appeal. Such appointment was made.

There is no exception to the charge of the court to the jury.

*Rufus L. Edmisten, Attorney General, by Jane Rankin Thompson, Associate Attorney, for the State.*

*T. S. Royster, Jr., and John H. Pike for Defendant.*

LAKE, Justice.

[1] The defendant's contention that his motion to dismiss the bill of indictment should have been granted for the reason that it con-

tains no attestation by the foreman of the grand jury that twelve or more grand jurors concurred in the finding of a true bill is without merit.

G.S. 15A-644 provides:

*"Form and content of indictment, information or presentment.—* (a) An indictment *must* contain:

(1) The name of the Superior Court in which it is filed;

(2) The title of the action;

(3) Criminal charges pleaded as provided in Article 49 of this Chapter, Pleadings and Joinder;

(4) The signature of the solicitor, but its omission is not a fatal defect; and

(5) The signature of the foreman or acting foreman of the grand jury attesting the concurrence of twelve or more grand jurors in the finding of a true bill of indictment." (Emphasis added.)

G.S. 15A-621 provides:

*"Grand jury defined.—* A grand jury is a body consisting of not less than 12 nor more than 18 persons, impaneled by a superior court and constituting a part of such court."

G.S. 15A-623 provides:

*"Grand jury proceedings and operation in general.—* (a) The finding of an indictment, the return of a presentment, and every other affirmative official action or decision of the grand jury requires the concurrence of at least 12 members of the grand jury."

In the present case, the indictment bears the signature of the foreman of the grand jury beneath the statement that the bill was found "a true bill" and the witnesses whose names were marked with an "X" were sworn by the foreman and examined by the grand jury. Since the statute requires the concurrence of at least 12 members of the grand jury in order to find an indictment a true bill, the foreman's signature attesting that the grand jury found the indictment to be a true bill, necessarily attests the concurrence of at least 12 of its members in this finding.

Although it is better practice for the foreman's entry upon the bill of indictment, over his signature, to state expressly that 12 or more grand jurors concurred in such finding, since even a directory provision of a statute should be obeyed, this is not necessary to the validity of the bill of indictment where the foreman's statement upon the bill is clearly so intended and there is nothing to indicate the contrary.

G.S. 9-27 (now repealed) provided, "The foreman of the Grand Jury *shall* mark on the bill the names of the witnesses sworn and examined before the jury." (Emphasis added.) In this connection, the word "shall" is equivalent to the word "must," which is used in G.S. 15A-644. Nevertheless, in *State v. Avant*, 202 N.C. 680, 163 S.E. 806 (1932), this Court, speaking through Justice George Connor, said, with reference to the contention that an indictment should be quashed for the failure of the foreman of the grand jury so to mark thereon the names of the witnesses examined by the grand jury, the foreman having signed the bill and returned it into court as "a true bill":

"The foreman of the grand jury is authorized by statute in this State to administer oaths and affirmatives to persons whose names are endorsed on a bill of indictment as witnesses for the State. He is required to mark on the bill the names of such persons as are sworn by him, and examined before the grand jury. C.S., 2336. In *S. v. Hollingsworth*, 100 N.C. 535, 6 S.E. 417, it is said: 'The endorsements on the bill form no part of the indictment, and it has been held that the act of 1879 (now C.S. 2336) [subsequently, G.S. 9-27] requiring the foreman of the grand jury, when the oath is administered by him, to mark on the bill the names of the witnesses sworn and examined before the grand jury, is merely directory, and a noncompliance therewith is no ground for quashing the indictment. *S. v. Hines*, 84 N.C. 810. It constitutes ground neither for a motion to quash, nor in arrest of judgment.' "

In *State v. Hines*, 84 N.C. 810 (1881), speaking through Justice Ashe, this Court said:

"Before the act of 1879 [the former G.S. 9-27] * * * the omission to designate the witnesses who may have been sworn, by a + mark, was not sufficient to quash the bill. The

fact that they were not sworn must have been established by proof offered by the defendant. * * *

"This principle we think has not been changed by the act of 1879, ch. 12, § 1, which * * * provides that the foreman should mark on the bill the names of the witnesses sworn and examined before the grand jury. We hold that this provision is merely directory, and that it is competent for the state, when the foreman has omitted to mark the witnesses sworn, to show by proof that they were sworn.

"In Massachusetts, they have an act of assembly (Rev. Statutes, ch. 136, § 9), which provides 'that a list of all witnesses sworn before the grand jury during the term shall be returned to the court under the hand of the foreman; and it has been there held that it is directory merely, and a noncompliance therewith is no ground for quashing an indictment.' *Com. v. Edwards*, 4 Gray (Mass.) 1."

In *State v. Avant, supra*, the failure of the foreman to mark the names of the witnesses examined by the grand jury, as directed by the statute, was brought to the attention of the court in time to permit this to be done while the grand jury was still present in the courtroom and this was permitted. However, in *State v. Mitchell*, 260 N.C. 235, 132 S.E. 2d 481 (1963), speaking through Justice Parker, later Chief Justice, this Court held that the above quoted provision of the old G.S. 9-27 was directory and not mandatory, and the bill of indictment should not be quashed because of such omission, even though it was not brought to the attention of the trial judge in time to permit such correction.

In *State v. Calhoon*, 18 N.C. 374 (1835), Chief Justice Ruffin, speaking for the Court, said:

"It is the practice for the foreman to sign his name to the finding of the grand jury; and it seems to be a salutary practice, as it tends to the more complete identification of the instrument containing the accusation. We do not know in what it had its origin; but though useful and proper, it does not seem to be essential, nor to have been, at any time, the course in England. * * * It is the grand jury's returning the bill into Court, and their publicly rendering their verdict on it, in the form 'a true bill,' and that being recorded or filed amongst the records of the Court, that makes it effectual."

In *State v. Lancaster*, 210 N.C. 584, 187 S.E. 802 (1936), the defendant contended that the indictment against him should be quashed, and the judgment pursuant to his conviction be arrested, for the reason that it did not appear by an endorsement of the foreman upon the indictment that any person whose name appeared on the back of the bill as a witness for the State had been sworn and testified before the grand jury. The court held that the motions to quash and in arrest of judgment were properly denied, saying in a Per Curiam opinion:

> "The absence of such endorsement was not sufficient to overcome the presumption of the validity of the indictment arising from its return by the grand jury as a 'true bill.' * * * The provisions of [the old G.S. 9-27] with respect to the duty of the foreman of the grand jury, are directory, and not mandatory." 210 N.C. at 585.

In 73 Am. Jur. 2d, Statutes, § 19, it is said: "In determining the mandatory or directory nature of a statute, the importance of the provision involved may be taken into consideration. Generally speaking, those provisions which are a mere matter of form, or which are not material, do not affect any substantial right, and do not relate to the essence of the thing to be done so that compliance is a matter of convenience rather than substance, are considered to be directory." To the same effect, *see*: 32 C.J.S., Statutes, §§ 376, 380; 12 Strong, N.C. Index 3d, Statutes, § 5.3.

While, ordinarily, the word "must" and the word "shall," in a statute, are deemed to indicate a legislative intent to make the provision of the statute mandatory, and a failure to observe it fatal to the validity of the purported action, it is not necessarily so and the legislative intent is to be derived from a consideration of the entire statute. To interpret G.S. 15A-644 as requiring the quashing of a bill of indictment under the circumstances of this case would be to attribute to the Legislature an intent to paramount mere form over substance. This we decline to do.

[2] The defendant's next contention is that it was error to deny his request that he, personally, be permitted to question prospective jurors on voir dire, and, subsequently, witnesses at the trial, in addition to questions propounded by his then counsel. There is no merit in this contention.

---

**State v. House**

---

It is well settled that a defendant in a criminal action has a right to represent himself at the trial and cannot be required to accept the services of court-appointed counsel. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed. 2d 562 (1975); *State v. Robinson*, 290 N.C. 56, 224 S.E. 2d 174 (1976); *State v. Mems*, 281 N.C. 658, 190 S.E. 2d 164 (1972); *State v. McNeil*, 263 N.C. 260, 139 S.E. 2d 667 (1965); *State v. Bines*, 263 N.C. 48, 138 S.E. 2d 797 (1964). It is, however, equally well settled that "[a] party has the right to appear *in propria persona* or by counsel, but this right is alternative," so that "one has no right to appear both by himself and by counsel." *State v. Phillip*, 261 N.C. 263, 268, 134 S.E. 2d 386, 391 (1964); *New Hanover County v. Sidbury*, 225 N.C. 679, 36 S.E. 2d 242 (1945); *Abernethy v. Burns*, 206 N.C. 370, 173 S.E. 899 (1934). *See also, State v. Robinson, supra.* Thus, while the defendant elected to retain the services of the court-appointed counsel, the court did not err in holding that the interrogation of prospective jurors and of witnesses must be done through his counsel.

[3] The defendant's third contention is that he was entitled to make an opening statement to the jury and the court's refusal of permission for him to do so was error. There is no merit in this contention.

G.S. 15A-1221(4) which provides "each party must be given the oportunity to make a brief opening statement," does not become effective until 1 July 1978, and, therefore, has no bearing upon the present case. The General Rules of Practice for the Superior and District Courts, promulgated by this Court pursuant to G.S. 7A-34 and published in 276 N.C. 735, relate to procedure in civil actions. Futhermore, Rule 9, thereof, upon which the defendant relies, states: "At any time before the presentation of evidence *counsel* for each party may make an opening statement setting forth the grounds for his claim or defense." (Emphasis added.)

The defendant's request in the present case was not for permission to have his then counsel make an opening statement but for permission to make such statement himself. When his request was denied, his counsel did not request that counsel be allowed to make such statement to the jury. Even if such a request by his counsel should have been granted, the defendant, for the reason

State v. House

above stated, while retaining the services of his court-appointed counsel was not entitled to make such statement *in propria persona.*

The defendant's fourth contention is that the court erred in refusing to direct the issuance of subpoenas for certain persons whom the defendant said he wished to call as witnesses and in refusing to permit him to call to the witness stand persons then in the courtroom pursuant to subpoenas previously issued.

[4] We turn to the refusal to issue the requested subpoenas. This request was made after the State rested its case. The court, by inquiries directed to the defendant, ascertained, to its satisfaction, that testimony which the defendant hoped to obtain from these persons would not be material and so declined to issue such subpoenas. In this we find no error.

The Constitution of North Carolina, Article I, § 23, provides:

"In all criminal prosecutions, every person charged with crime has the right * * * to confront the accusers and witnesses with other testimony * * *."

The Constitution of the United States, in Amendment VI, made applicable to the states by Amendment XIV (*Washington v. Texas,* 288 U.S. 14, 87 S.Ct. 1920, 18 L.Ed. 2d 1019 (1967)), provides:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor. * * *."

G.S. 15A-801 provides for the issuance of subpoenas for proposed witnesses in a criminal proceeding and provides that these shall be issued and served in the manner provided in Rule 45 of the Rules of Civil Procedure, G.S. 1A-1, for the issuance and service of subpoenas in civil actions. That rule provides for the issuance of subpoenas by the Clerk of the Superior Court, but also provides for the issuance of subpoenas over the signature of the party or his counsel. It also provides for service of subpoenas by the sheriff "or by any other person not less than 18 years of age, who is not a party."

Thus, the defendant had it within his power to issue, and have served, subpoenas requiring the attendance of the persons in question. It is abundantly clear from the record that whatever ability these people had, to give information pertinent to this prosecution, was known to the defendant long before the trial began. No reason is suggested in the record for the defendant's failure to subpoena these proposed witnesses prior to the trial, or his failure to advise his then counsel of his desire to have them subpoenaed, if, indeed, he did so fail to advise his counsel.

Furthermore, it does not appear that the testimony which the defendant hoped to elicit from any of these proposed witnesses would have been material in the trial of this action. According to the defendant's responses to the inquiries of the court, two of them were men whom he suspected of having committed adultery with his wife. Assuming, which seems unlikely, that these men, if called to the witness stand, would acknowledge such conduct, it would not be material to the trial of the present action in view of the fact that it occurred, if at all, ten and eleven years prior to the defendant's shooting of his wife and after he, with knowledge thereof, condoned the misconduct and he and his wife became reconciled and renewed their marital relations. Another was a minister, not shown to have any knowledge of any circumstance related to the shooting, or of the defendant's mental or emotional condition, or of his character or reputation.

As we said in *State v. Wells*, 290 N.C. 485, 491, 226 S.E. 2d 325, 330 (1976), "Here, defendant's lack of diligence in placing his witnesses under subpoena when he had ample opportunity to do so, thus requiring their attendance from day to day, forestalls his belated attempt to place responsibility on the trial judge for their absence." Furthermore, as was said in *Hoskins v. Wainwright*, 440 F. 2d 69, 71 (5th Cir., 1971), "The right to compulsory process is not absolute, and a state may require that a defendant requesting such process at state expense establish some colorable need for the person to be summoned, lest the right be abused by those who would make frivolous requests." We, therefore, find no ground for disturbing the judgment below by reason of the refusal of the trial judge to issue subpoenas as requested by the defendant.

[5] A more difficult question is presented by the defendant's contention that the trial judge refused to permit him to call to the

witness stand persons who were then in the courtroom pursuant to subpoenas previously issued. In *State v. Wells, supra,* speaking through Justice Huskins, we said:

> "The right of an accused to offer the testimony of witnesses and to compel their attendance by compulsory process, if necessary, is a basic ingredient of the right to present a defense, i.e., the right to present the defendant's version of the facts, as opposed to the prosecution's, so the jury may decide where the truth lies." 290 N.C. at 490-491, 226 S.E. 2d at 329.

Again, in *State v. Pike,* 273 N.C. 102, 107, 159 S.E. 2d 334, 338 (1968), speaking through Justice Branch, we said:

> "It is basic to due process that a defendant in a criminal action be allowed to offer testimony. When the trial judge heard the State's witness on *voir dire,* he should have given defendant an opportunity to offer evidence to present his version of the search and seizure or to contradict, amplify, or explain the testimony offered by the State."

*See also, State v. Hunt,* 289 N.C. 403, 222 S.E. 2d 234, death sentence vacated, 429 U.S. 809 (1976).

As above recounted in the statement of facts, the defendant testified at length in his own behalf and was permitted to call to the stand other witnesses and present their testimony before the jury. However, certain witnesses, present in the courtroom and under subpoena and proposed to be called by the defendant, were first examined by the court, in the absence of the jury, and, as the result of those examinations, the court concluded that they knew nothing about the circumstances of the shooting, the defendant's then mental or emotional state or other matters material to the issue before the jury, or that the evidence they would give was so prejudicial to the defendant that it would seriously prejudice his defense to put them on the witness stand. Notwithstanding the court's original admonition to the defendant that, if the defendant discharged his court-appointed counsel and proceeded to represent himself, the court would not assist the defendant with reference to the rules of evidence, the court refused to allow the defendant to put these proposed witnesses on the stand. Obviously, the court was endeavoring to protect the defendant from disaster due to the defendant's bad trial tactics.

In this, we think the court was clearly in error. It would, of course, have been proper for the court to sustain appropriate objections by the State to specific questions, for the reason that the testimony so proposed to be elicited would be immaterial and irrelevant. The trial court, however, was not authorized to forbid the defendant to offer evidence, otherwise competent, for the reason that, in the judgment of the court, however sound, such evidence would be detrimental to the defendant. The defendant, whether represented by counsel or appearing *in propria persona*, is entitled to use his own judgment as to the wisdom of introducing otherwise competent evidence. To deny him this right is to deny him his constitutional rights afforded both by the Sixth Amendment to the Constitution of the United States and Article I, § 23, of the Constitution of North Carolina, as above quoted. *Washington v. Texas, supra; State v. Wells, supra; State v. Pike, supra.*

Nevertheless, not every constitutional error, either State or Federal, is ground for granting a new trial. If it plainly appears from the record that such error "was harmless beyond a reasonable doubt," the Supreme Court of the United States has said the judgment will not be disturbed on that account. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967); *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed. 2d 171 (1963). The doctrine of harmless error has repeatedly been applied by this Court, using the same test. *State v. Cradle*, 281 N.C. 198, 188 S.E. 2d 296 (1972); *State v. Taylor*, 280 N.C. 273, 185 S.E. 2d 677 (1972); *State v. Fletcher and Arnold*, 279 N.C. 85, 181 S.E. 2d 405 (1971); *State v. Brinson*, 277 N.C. 286, 177 S.E. 2d 398 (1970); *State v. Turner*, 268 N.C. 225, 150 S.E. 2d 406 (1966); *State v. Bryant*, 236 N.C. 745, 73 S.E. 2d 791 (1953); *State v. Bovender*, 233 N.C. 683, 65 S.E. 2d 323 (1951). In the *Bovender* case, speaking through Justice Devin, later Chief Justice, this Court said:

"Verdicts and judgments are not to be lightly set aside, nor for any improper ruling which did not materially and adversely affect the result of the trial. *Collins v. Lamb*, 215 N.C. 719, 2 S.E. 2d 863. An error cannot be regarded as prejudicial unless there is a reasonable probability that the result would have been different." 233 N.C. at 690, 65 S.E. 2d at 330.

. Our careful review of the disclosures of the defendant's proposed witnesses in response to the court's inquiries directed to them, in the absence of the jury, makes it abundantly clear to us that none of these witnesses would have testified to any matter conceivably beneficial to the defendant. The defendant's own assertions as to what these witnesses could add to his presentation of his defense does nothing whatever to cast doubt upon this conclusion. As Justice Barnhill, later Chief Justice, said in *State v. Bryant, supra: "On this record* he could have no reasonable hope of acquittal in a future trial, for such a verdict would manifest a clear miscarriage of justice. Hence the verdict and judgment must be sustained." 236 N.C. at 748, 73 S.E. 2d at 792.

[6] We, likewise, find no merit whatever in the defendant's fifth contention, which is that the court should not have permitted him to represent himself since he did not waive in writing his right to counsel. G.S. 7A-457, dealing with waiver of counsel prior to the acceptance of a plea of guilty, has no application to the present case. Here, the defendant, having been appointed counsel for the trial of this case and not contending, either then or now, that such counsel was not competent, exercised his constitutional right (*see, Faretta v. California, supra*) to represent himself for the remainder of his trial. This was done after the court, upon proper inquiry, ascertained that this was, indeed, the desire of the defendant, notwithstanding the court's advising him that he would be subject to the same rules of evidence applicable to defendants represented by counsel. Under these circumstances, the court had no choice but to permit the defendant so to proceed, and, in so doing, committed no error.

That the defendant's court-appointed trial counsel was competent is not only presently unquestioned by the defendant but is affirmatively established by his assignment of error which we next note.

[7] The defendant's final contention is that the court below erred in not appointing his court-appointed trial counsel to represent him on this appeal. Normally, it is obviously advisable to appoint a defendant's trial counsel, with or without other counsel to assist him, for purposes of presenting his appeal and we are not to be understood as suggesting the contrary. However, the

defendant's present contention is sufficiently answered by noting that, at the conclusion of his trial, the defendant addressed the trial court as follows:

"I make a motion on mutual agreement between Mr. Finch and myself that another lawyer be appointed to me to make a legal and fair appeal to the North Carolina Supreme Court."

His court-appointed trial counsel was then present in the court having remained therein, throughout the trial, at the direction of the trial judge in order to be available to the defendant for such legal advice as the defendant might desire.

We find no merit whatever in any of the defendant's assignments of error brought forward in his brief. Other assignments of error, contained in his statement of the case on appeal, are deemed abandoned. Rule 28 of the Rules of Appellate Procedure, 287 N.C. 679, 741. We have, however, examined these also and find no merit therein.

No error.