STATE OF NORTH CAROLINA v. LARRY DARNELL WILLIAMS

No. 4

(Filed 1 December 1981)

**1. Criminal Law § 15.1 — change of venue — pretrial publicity — denial of motion not error**

After an examination of articles appearing in area newspapers, the Court could not find that the trial judge abused his discretion when the judge denied defendant's pretrial motion for a change of venue and ruled that defendant had not met the burden of establishing "so great a prejudice . . . that he [could] not obtain a fair and impartial trial." G.S. 15A-957.

**2. Constitutional Law §§ 18, 32 — indirect attempt to impose "gag" order — denial proper**

Defendant's First and Fourth Amendment rights were not violated by the denial of his pretrial motion to prohibit all attorneys, their assistants, investigators, and employees, the Cabarrus County Superior Court Clerk, the County Sheriff, the County Jailer, police officials and other law enforcement officers and employees, and all witnesses associated with the case from commenting on it to any newspaper, radio, or television reporters, agents, or employees within Cabarrus County during the course of the proceedings as (1) there was no showing that at the time the matter was before the trial judge there existed any intense or pervasive pretrial publicity which was adverse to defendant and the impact of such publicity would at best have been merely speculative, and (2) there was no *in personam* jurisdiction sought, and a group such as defendant sought to restrain cannot as a matter of practicality be restrained from discussing pending cases with others. U.S. Const., Amend. VI, XIV; N.C. Const., Art. I, §§ 19, 23, 24.

**3. Criminal Law § 101.2 — pretrial published statement of judge — no prejudicial error**

The use of the words "gas chamber" by the trial judge in an article published about 30 days prior to trial did not result in prejudicial error warranting a new trial.

**4. Constitutional Law § 31 — denial of additional court-appointed assistance at trial — proper**

The trial court did not err in denying defendant's motion for additional counsel, a research assistant, a statistician, and a jury selection expert as the record disclosed nothing which showed there was a reasonable likelihood that the appointments requested by defendant's motions would have materially assisted defendant in the preparation or presentation of his defense or that without such assistance it is probable that defendant did not receive a fair trial. G.S. 7A-450(b); G.S. 7A-454.

5. **Constitutional Law § 45— no right to act as co-counsel with court-appointed attorney**

    The trial court did not err in denying defendant's motion to allow him to act as co-counsel with his court-appointed attorneys. A criminal defendant cannot represent himself and, at the same time, accept the services of court-appointed counsel.

6. **Criminal Law § 91.1— motion for continuance until trial on other charges**

    The trial judge did not abuse his discretion in failing to allow a continuance of defendant's trial until the disposal of charges brought against him concerning a killing and robbery which occurred shortly before the robbery and murder for which he was tried.

7. **Indictment and Warrant § 14— motion to quash indictment—coerced confession—insufficient ground**

    A motion to quash an indictment lies where a defect appears on the face of the indictment; therefore, the trial court did not err in denying defendant's motion to quash the indictments and dismiss the charges against him on the ground that the indictments were based upon a coerced confession by a witness which implicated defendants.

8. **Criminal Law § 77.3— testimony of defendant's girlfriend—coerced—properly admitted**

    In a first degree murder and armed robbery trial, the court did not err in admitting the testimony of defendant's girlfriend which resulted from a plea bargain arrangement and which implicated defendant even though there was evidence that her original statements to police had been coerced. Evidence of any police coercion in obtaining her statement went to the credibility of the testimony, which was a jury question.

9. **Criminal Law §§ 77, 88— refusal of witness to testify at voir dire—cross-examination at trial—right of confrontation not violated**

    Defendant was in no position to complain that he was denied his constitutional right to confront a witness who testified against him where a codefendant, at the time of a pretrial voir dire, exercised her Fifth Amendment guarantee against self-incrimination and refused to testify concerning alleged inculpatory statements made by her to police officers, but at trial, as the charges had been dropped against her, she testified and defense counsel extensively cross-examined her.

10. **Constitutional Law § 80— constitutionality of death penalty—no impermissible expansion of Court's jurisdiction**

    The death penalty statute is not unconstitutional on the ground that it constitutes cruel and unusual punishment violating the Eighth and Fourteenth Amendments of the United States Constitution, nor does the statute impermissibly extend the Court's jurisdiction without a constitutional amendment in violation of Article IV, Section 12, of the North Carolina Constitution as G.S. 15A-2000(d) vests automatic review in the Supreme Court of North Carolina and provides standards and guidelines for review of the death sentence by the Supreme Court.

**11. Indictment and Warrant § 13.1 — denial of motion for bill of particulars proper**

    The trial court correctly denied defendant's motion for a bill of particulars pursuant to G.S. 15A-925 as it requested some matters which were capable of being ascertained by viewing the murder scene and were therefore discoverable under G.S. 15A-901, *et seq.*, and it requested other information which was beyond the scope of G.S. 15A-925(c) as it requested "matters of evidence."

**12. Constitutional Law § 28; Judges § 1 — no prejudice in rotating judges**

    Our system of superior court judge rotation under Article IV, Section 11, of the North Carolina Constitution is constitutionally valid, and defendant failed to demonstrate error or show prejudice in the denial of his motion for one judge to retain jurisdiction of his case throughout its pendency both during the pretrial stage and at trial.

**13. Constitutional Law § 31 — refusal to release defendant to seek alibi witnesses**

    There was no abuse in discretion in the trial court's refusal to release defendant, who was charged with first degree murder and armed robbery, from custody in order that he might seek alibi witnesses.

**14. Criminal Law § 158 — failure to include in record order denying pretrial motions**

    The Court is bound by the record before it, and in the absence of anything in the record to indicate otherwise, must assume that the trial judge ruled properly on matters before him. Therefore, the Court could not properly review the denial of defendant's trial motions where there was (1) no order by the trial court denying the motions, (2) no record of the proceedings in which the motions were said to have been denied, (3) nothing before the Court to indicate the grounds presented for granting these motions, and (4) nothing before the Court indicating upon which ground the motions were denied.

**15. Jury § 6 — district attorney's ties with prospective jurors — proper subject for voir dire**

    The court did not err in denying defendant's motion to require the district attorney and his staff to disclose personal, business, social, church, and civic ties with the prospective jurors as the proper way to inquire into such matters is on the jury voir dire.

**16. Criminal Law § 87.1 — leading questions — no abuse of discretion**

    The defendant failed to show abuse of discretion on the part of the trial judge where he allowed numerous leading questions by the district attorney as (1) they suggested no facts which were not obviously a part of the witness's prior testimony, (2) in the remaining questions which elicited an answer, defense counsel failed to properly object or preserve his exceptions by a motion to strike, and (3) there was nothing in the content of the challenged questions or answers which added strength to the State's case.

**17. Criminal Law § 90 — clarification of witness's testimony — no impeachment of own witness**

    Asking the State's witness "were you saying that you were uncertain that he was the man that walked in the store with the gun?" was not improper as

State v. Williams

the purpose of this question was not to discredit the witness's testimony but merely to clarify the fact that her doubts were directed not to defendant's involvement in the shooting but to the question of whether defendant was the one who actually pulled the trigger.

18. **Criminal Law § 135.4— sentencing phase—no requirement to indicate aggravating circumstances in indictment**

The indictment against defendant met the due process requirements of the United States Constitution, met the requirements of the North Carolina Constitution, and properly activated the provisions of G.S. 15A-2000 *et seq.*, where it complied with the short form indictment authorized by G.S. 15-144. An indictment need not allege one or more aggravating circumstances to support a judgment imposing a death penalty. G.S. 15A-2000(a)(1), (b), (e) and (f).

19. **Criminal Law §§ 34.5, 34.6— evidence of prior crime—admissible to show intent and identity**

In a prosecution for murder and armed robbery, the trial judge did not err in admitting evidence of a murder and armed robbery that occurred hours prior to the murder and robbery in question as the evidence of the earlier crime tended to show intent and identity.

20. **Criminal Law § 135.4— sentencing phase—submission of an aggravating circumstance improper**

In a prosecution for murder and armed robbery, the trial court erred in submitting the aggravating circumstance that "the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody," G.S. 15A-2000(e)(4), as there was not sufficient evidence from which a jury could reasonably infer such a motivating factor in the killing. The error was prejudicial as the jury answered issues submitted on three aggravating circumstances against defendant and one or more of seven mitigating circumstances in his favor, and it was reasonably possible that the submission of the erroneous issue may have tipped the balance in favor of the death sentence.

APPEAL by defendant from *Seay, J.,* 4 February 1980 Session of CABARRUS Superior Court.

Defendant was charged in bills of indictment, proper in form, with the first-degree murder and armed robbery of Susan Verle Pierce. At the guilt determination phase of the trial, the State offered evidence tending to show that Susan Verle Pierce was working as a clerk at the Seven-Eleven convenience store operated by the Southland Corporation on North Church Street in Concord, North Carolina on the 11:00 p.m., 2 June 1979, to 7:00 a.m., 3 June 1979, shift. She was seen alive at 6:00 a.m. on 3 June 1979 by a customer who returned to the store a short time later and found her lying on the floor with a wound at the base of her neck. Police, medical personnel, and officials of the Southland Cor-

poration were summoned to the scene where it was ascertained that Mrs. Pierce was dead and that $67.27 was missing from the store's cash register. It was later determined that Mrs. Pierce's death was caused by a shotgun blast to her neck and that the shotgun was fired from three to nine feet away. Southland Corporation and its management personnel offered a $5,000 reward for information leading to the conviction of Mrs. Pierce's killer.

Linda Massey, defendant's girlfriend, testified that in the late morning of Saturday, 2 June 1979, she began to smoke marijuana and drink beer, wine, and vodka. Later on that day, she exchanged her Pinto automobile with Robert Brown so that she, defendant, and her fourteen-year-old nephew, Darryl Brawley, could ride around in Brown's Oldsmobile. The three of them left the witness's apartment in Charlotte in the early afternoon, and after stopping at a couple of taverns and an acquaintance's apartment, they picked up a man who throughout her testimony the witness referred to as the "dude." They continued to drink and smoke marijuana as they rode around. On the way to and in Gastonia, they stopped at several service stations and convenience stores, and upon returning to the automobile at each store the witness would report whether it was crowded or not. At one station they stopped at in Gastonia, defendant and the "dude" entered the station and the witness, who had remained in the automobile on this occasion, heard a sound like a backfire. After leaving this station, the witness assumed a position in the back seat and the man she identified as the "dude" began driving. She was "high" on alcohol and marijuana and dozed intermittently as they proceeded to Concord. In Concord they stopped at another store, and defendant and the unidentified "dude" went into the store. Shortly thereafter, defendant returned to the automobile and carried what appeared to the witness to be a shotgun into the store. She then heard a noise that sounded like an automobile crashing into a building and observed the female attendant in the store grab her chest near her left shoulder. Defendant then returned to the automobile, and they proceeded to the witness's apartment in Charlotte.

The witness testified on cross-examination that when she was first taken to jail in Gastonia, she was told by the police that her children would be taken away from her and that she would be the first woman in the country to die in the gas chamber unless she

agreed with what they said and cooperated with them. The witness admitted that she had given five different stories about the happenings on 2 and 3 June 1979 for the reasons that she was scared and she did not want defendant to be involved because she loved him. She stated that as a result of plea bargain charges against her were reduced from first-degree murder and armed robbery to accessory after the fact of these crimes.

Darryl Brawley, after plea bargaining for a reduction of the charges against him from first-degree murder and armed robbery to accessory after the fact to these crimes, testified to facts which were essentially the same as those testified to by the witness Massey. In addition, he identified the third man in the automobile as "Danny Brown" and pointed him out in the courtroom as co-defendant Riley Edward Devore. He further stated that after picking up "Danny Brown," defendant put a shotgun shell in the shotgun and said, "Let's go to Concord or Gastonia and make some money." He testified that he saw defendant and "Danny Brown" run into a service station booth, tackle the attendant, remove money from the cash register, and heard the gun go off while it was pointed at the attendant. He did not testify as to the events surrounding the killing of Mrs. Pierce and the robbery of the Seven-Eleven convenience store. Other testimony indicated that he had previously told police officers investigating the killing of Mrs. Pierce that defendant had shot a woman in the chest with a .20 gauge sawed-off shotgun.

The State also offered the testimony of Evelyn Kindley, who testified that at about 6:10 a.m. on 3 June 1979 she passed the Seven-Eleven store on North Church Street in Concord and saw a black male aged sixteen to twenty-five years old sitting on the passenger seat of an automobile in the store's parking lot with his feet on the ground. He was slumped forward as if he were tying his shoes or fumbling with his legs. She also observed that the attendant in the store was standing behind the counter and appeared to be looking at something in the back of the store.

There was evidence which tended to show that one of defendant's fingerprints was found on the inside of the rear passenger side window of Robert Brown's Oldsmobile.

Defendant testified that on Saturday, 2 June 1979, after visiting with his mother in Charlotte, North Carolina, he went to

his sister's house in Charlotte where he remained until night. His sister then carried him to his wife's house in Charlotte where he spent the night with his wife and his three sons. He remained there until the afternoon of Sunday, 3 June 1979. He stated that he did not see the witness Linda Massey until the afternoon of Sunday, 3 June 1979. Defendant's sister, his wife, and his wife's sister offered testimony which tended to corroborate defendant's testimony regarding his whereabouts on Saturday, 2 June 1979, and Sunday morning, 3 June 1979.

On rebuttal the State offered the testimony of Detective Douglas Rivelle of the Gastonia Police Department who stated that defendant told him and other police officers that on the night of 2 June 1979 and the morning of 3 June 1979 he was with Linda Massey and a fourteen-year-old boy smoking marijuana and drinking wine.

The jury returned a verdict of guilty of first-degree murder on the theory of felony murder and a verdict of guilty of robbery with a firearm. The conviction for armed robbery was arrested since it was the underlying felony upon which the felony murder conviction was based. Co-defendant Riley Edward Devore was found not guilty on all charges.

Pursuant to the provisions of G.S. 15A-2000(a)(1), the court proceeded to conduct the sentencing phase to determine whether defendant should be sentenced to death or life imprisonment. The State again presented evidence concerning the robbery and killing of the service station attendant in Gastonia. Defendant offered evidence of his good behavior while incarcerated in Cabarrus County Jail, and a stipulation was entered showing that defendant's intelligence quotient was sixty-nine.

At the conclusion of the evidence on the sentencing proceeding, the trial court instructed the jury on the sentencing phase. Three aggravating circumstances were submitted to the jury: (1) whether the murder was committed for the purpose of avoiding or preventing lawful arrest; (2) whether the murder was committed for pecuniary gain; and (3) whether the murder was part of a course of conduct in which Larry Darnell Williams engaged and did that course of conduct include the commission by the defendant of other crimes of violence against other persons? Seven mitigating circumstances were submitted to the jury:

(1) Larry Darnell Williams has no significant history of prior criminal activity.

(2) That Larry Williams was gainfully employed when the murder occurred.

(3) That Larry Williams voluntarily admitted himself to Open House in Charlotte for rehabilitation for drug problems in October 1975 and January and February of 1976.

(4) That Larry Williams has an intelligence quotient (IQ) of 69.

(5) That Larry Williams was of good conduct while in the Cabarrus County jail.

(6) That Larry Williams conducted himself in a normal business manner with Attorney Karl Adkins in a personal injury case.

(7) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

The jury found beyond a reasonable doubt each of the aggravating circumstances submitted. The jury also found that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. After finding one or more of the seven mitigating circumstances, although it did not designate which ones were found, the jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. The jury then recommended that the death penalty be imposed, and the court entered judgment imposing the death penalty for the crime of first-degree felony murder. Defendant appealed of right to this Court from the judgment imposed.

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, for the State.*

*Webster S. Medlin and Steve L. Medlin for defendant appellant.*

BRANCH, Chief Justice.

Defendant's brief brings forward forty-seven assignments of error with little semblance of continuity. We have therefore

elected to consider the assignments of error under the general headings of pretrial motions, guilt phase of the trial, and sentencing phase of the trial.

## I. PRETRIAL MOTIONS

[1] Defendant first assigns as error the denial of his pretrial motions for change of venue or in the alternative for a special venire due to the publicity his case had received prior to trial.

The record includes as exhibits articles which appeared in newspapers in the Cabarrus County area. Defendant asserts these articles were "reasonably likely" to prejudice potential jurors. *See Sheppard v. Maxwell,* 384 U.S. 333, 16 L.Ed. 2d 600, 86 S.Ct. 1507 (1966). Examination of these articles discloses that they are factual, non-inflammatory, accurate reports. Defendant's motion was addressed to the sound discretion of the trial judge. *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L.Ed. 2d 1137, 100 S.Ct. 3050, *reh. denied,* 448 U.S. 918, 65 L.Ed. 2d 1181, 101 S.Ct. 41 (1980). We cannot say, after a thorough examination of these exhibits, that the trial judge abused his discretion when he ruled that defendant had not met the burden of establishing "so great a prejudice . . . that he [could] not obtain a fair and impartial trial." G.S. 15A-957. *See State v. Oliver,* 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Barfield, supra; State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222, *death sentence vacated, sub nom, Carter v. North Carolina,* 429 U.S. 809, 50 L.Ed. 2d 69, 97 S.Ct. 46 (1976).

[2] Defendant also assigns as error the denial of his motion to control pretrial publicity. By this motion, defendant sought to prohibit all attorneys, their assistants, investigators, and employees, the Cabarrus County Superior Court Clerk, the County Sheriff, the County Jailer, police officials and other law enforcement officers and employees, and all witnesses associated with the case from commenting on it to any newspaper, radio, or television reporters, agents, or employees within Cabarrus County during the course of the proceedings.

The motion was filed on 11 September 1979 and was heard by Judge Collier on 14 November 1979. His order denying the motion was entered on 27 November 1979.

The first and fourteenth amendments to the United States Constitution and Article I, Section 14, of the North Carolina Constitution guarantee freedom of speech and freedom of the press.

These constitutions are equally clear in their guarantee that every criminal defendant shall receive a fair trial. U.S. CONST., Amend. VI, XIV; N.C. CONST., art. I, §§ 19, 23, 24. The framers of our federal and state constitutions gave no priorities to these fundamental guarantees but left to the courts the delicate task of balancing the defendant's constitutionally guaranted right to a fair trial against the constitutional guarantees of freedom of speech and freedom of the press. *New York Times Co. v. United States,* 403 U.S. 713, 29 L.Ed. 2d 822, 91 S.Ct. 2140 (1971).

The United States Supreme Court considered a question of prior restraint in *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 49 L.Ed. 2d 683, 96 S.Ct. 2791 (1976). In ruling that the order restraining publication of news was too vague and too broad to survive the scrutiny given to restraints on first amendment rights, the Court noted that even pervasive, adverse publicity does not inevitably lead to an unfair trial and that any prior restraint on expression comes to the courts with a heavy presumption against its constitutional validity. Thus one seeking to impose a "gag" rule carries a heavy burden of showing justification for the imposition of such a rule.

Here the motion did not directly seek to restrain the news media but sought to restrain a large group of unnamed public officials and lawyers from commenting on the case to the agents or employees of the news media. Even so, it was an attempt to indirectly impose a prior restraint upon the news media and to impose a "gag" order upon assorted people in violation of the state and federal constitutional guarantees. Seventeen of the nineteen news articles submitted in support of defendant's motion were printed shortly after the killing occurred in June, 1979, over four months before the hearing before Judge Collier. Thus, there was no showing that at the time the matter was before Judge Collier there existed any intense or pervasive pretrial publicity which was adverse to defendant. Had he allowed the motion to control the pretrial publicity, his conclusion as to the impact of such publicity would at best have been merely speculative. Further, the very nature of the relief that defendant sought brings into clear focus the impossibility of enforcing such a pretrial order. There was no *in personam* jurisdiction sought, and a group such as defendant sought to restrain cannot as a matter of practicality be restrained from discussing pending cases with others. We therefore hold that Judge Collier correctly denied defendant's motion. Our holding is strongly supported by the fact that at trial

defendant apparently did not pursue his "publicity tainted" argument during jury voir dire since the record gives no indication whether any juror was stricken because of prejudice allegedly caused by pretrial publicity.

[3] By his next assignment of error defendant contends that a quotation in *The Charlotte Observer* attributed to the trial judge resulted in prejudicial error warranting a new trial.

The 8 January 1980 edition of *The Charlotte Observer* quoted Judge Seay as saying:

> "There is not a lot of sweetness and light when you are talking about someone going to the gas chamber," Seay said. "This is an extremely adversary proceeding."

Defendant takes the position that the use of the words "gas chamber" in the article published about thirty days before the trial resulted in prejudicial error. He also seems to contend that the statement indicated a lack of impartiality on the part of the trial judge. We do not agree. The more reasonable interpretation of the statement is that Judge Seay was merely indicating the obvious fact that a case involving the death penalty is one that will be hotly contested. Neither can we find anything in the quoted statement which indicates that he was partial to either the State or defendant. Further, the record does not indicate that any juror was even aware of the statement attributed to the judge or that the defendant was forced to accept a juror who had knowledge of the quoted remark.

Defendant has failed to show any possible prejudice resulting from the remark attributed to Judge Seay.

[4] Assignments of error 2, 6, 23, and 26 will be considered collectively since they relate to court-appointed assistance at trial. It is defendant's position that the trial judge erred by denying his motions for additional counsel, a research assistant, a statistician, and a jury selection expert. In support of his position, he relies upon the provisions of G.S. 7A-450(b) and 7A-454 which in pertinent part provide:

> G.S. 7A-450(b). Whenever a person, under the standards and procedures set out in this Subchapter, is determined to be an indigent person entitled to counsel, it is the responsibility of the State to provide him with counsel and the other necessary expenses of representation.

G.S. 7A-454. The court, in its discretion, may approve a fee for the service of an expert witness who testifies for an indigent person, and shall approve reimbursement for the necessary expenses of counsel. Fees and expenses accrued under this section shall be paid by the State.

This Court has considered similar motions on several occasions. In *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976), the indigent defendant moved that a private investigator be appointed. We there expressed our opinion concerning the appointment of "experts" for indigent defendants in this language:

> [O]ur statutes and the better reasoned decisions place the question of whether an expert should be appointed at State expense to assist an indigent defendant within the sound discretion of the trial judge. We adopt that rule. However, we feel that the appointment of an investigator as an expert witness is a matter *sui generis*. There is no criminal case in which defense counsel would not welcome an investigator to comb the countryside for favorable evidence. Thus, such appointment should be made with caution and only upon a clear showing that specific evidence is reasonably available and necessary for a proper defense. Mere hope or suspicion that such evidence is available will not suffice. For a trial judge to proceed otherwise would be to impede the progress of the courts and to saddle the State with needless expense.

*Id.* at 82, 229 S.E. 2d at 567-68.

Thereafter we were faced with a motion for the appointment of a serologist and a private investigator for an indigent defendant in *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977). We there held:

> There are, then, no constitutional or legal requirements that private investigators or expert assistance *always* be made available simply for the asking. (Citation omitted.) Our statutes, G.S. 7A-450(b) and 7A-454, as interpreted in *Tatum* and *Montgomery* require that this kind of assistance be provided only upon a showing by defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense or that without such help it is probable that defendant will not receive a fair trial. Neither the state nor the federal constitution requires more.

292 N.C. at 278, 233 S.E. 2d at 911. *See also, State v. Easterling,* 300 N.C. 594, 268 S.E. 2d 800 (1980).

We considered a motion for the appointment of associate counsel in *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979), and there stated:

> Defendant contends that the trial judge erred in denying his motion for appointment of associate counsel. Defendant cites no authority in support of this contention but states that additional counsel should have been appointed. As in the case of providing private investigators or other expert assistance to indigent defendants, we think the appointment of additional counsel is a matter within the discretion of the trial judge and required only upon a showing by a defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense or that without such help it is probable that defendant will not receive a fair trial. (Citations omitted.)

*Id.* at 362-63, 259 S.E. 2d at 758. *See also, State v. Easterling, supra; State v. Montgomery,* 291 N.C. 91, 229 S.E. 2d 572 (1976).

In addition to the statutory authority above cited, defendant relies strongly upon the "reasonable likelihood" standard which was adopted in the foregoing opinions. He contends that he has shown that the allowance of additional assistance requested by his motions would have materially assisted in the preparation and presentation of his case and that without such assistance he was denied a fair trial.

Defendant has presented no evidence to show that the jury selection process was challenged or that the services of a statistician would have resulted in the selection of a more favorable jury. Neither do we find any indication that a jury selection expert would have enabled defendant's counsel to conduct a better voir dire of the jury panel. Our review of the record indicates that defendant's two court-appointed counsel aggressively and vigorously represented defendant at trial and conscientiously pursued his case on appeal.

In summary, the record discloses nothing which shows that there is a reasonable likelihood that the appointments requested by defendant's motions would have materially assisted defendant in the preparation or presentation of his defense or that without such assistance it is probable that defendant did not receive a fair trial.

These assignments of error are overruled.

[5] Defendant contends that the trial court erred in denying his motion to allow him to act as co-counsel with his court-appointed attorneys. This contention is without merit.

Although a criminal defendant cannot be required to accept the services of court-appointed counsel, *State v. Mems*, 281 N.C. 658, 190 S.E. 2d 164 (1972); *State v. Morgan*, 272 N.C. 97, 157 S.E. 2d 606 (1967), we have previously said that a criminal defendant cannot represent himself and, at the same time, accept the services of court-appointed counsel. *State v. House*, 295 N.C. 189, 244 S.E. 2d 654 (1978), answered this very question as follows:

> It is well settled that a defendant in a criminal action has a right to represent himself at the trial and cannot be required to accept the services of court-appointed counsel. (Citations omitted.) It is, however, equally well settled that "[a] party has the right to appear *in propria persona* or by counsel, but this right is alternative," so that "one has no right to appear both by himself and by counsel." (Citations omitted.) Thus, while the defendant elected to retain the services of the court-appointed counsel, the court did not err in holding that the interrogation of prospective jurors and of witnesses must be done through his counsel.

*Id.* at 204, 244 S.E. 2d at 662.

The Court's decision in *House* clearly answers the question posed by this assignment of error adversely to defendant's contention.

Several of defendant's remaining assignments of error relate to the denial of other pretrial motions.

[6] The first of these is addressed to the trial court's failure to allow a continuance of the trial until the disposal of the charges brought against him in the Gastonia killing and robbery. He contends that in order to preserve the chronological continuity of events the Gastonia matter should have been heard before the Cabarrus County charges were tried. Failure to dispose of the charges in chronological order, he argues, prejudiced his case in the eyes of the jury through the introduction of evidence regarding the Gastonia events in the trial of the Cabarrus County matter.

It is well settled in this State that a motion for continuance which is not based on constitutional guarantees is ordinarily addressed to the sound discretion of the trial court. In the absence of an abuse of discretion, the denial of a continuance will not be held error on appeal. *State v. Easterling, supra; State v. Thomas*, 294 N.C. 105, 240 S.E. 2d 426 (1978).

Defendant's assignment of error on this point is overruled for the reason that there is no showing that the trial court abused its discretion in denying the motion for continuance.

Defendant, in three assignments of error related to witness Linda Massey's statements to police and trial testimony, argues that the indictments should have been quashed and the charges against him dismissed, and that Massey should have been precluded from testifying against him at trial.

[7] By assignment of error number 3 defendant asserts that the trial court erred in denying his motion to quash the indictments and dismiss the charges against him on the ground that the indictments were based upon a coerced confession by the witness Massey which implicated defendant. A motion to quash an indictment lies where a defect appears on the face of the indictment and will be granted when it appears from an inspection of the indictment that no crime is charged or that the indictment is otherwise so defective that it will not support a judgment. *State v. Underwood*, 283 N.C. 154, 195 S.E. 2d 489 (1973); *State v. Springer*, 283 N.C. 627, 197 S.E. 2d 530 (1973); *State v. Bass*, 280 N.C. 435, 186 S.E. 2d 384 (1972); *State v. McBane*, 276 N.C. 60, 170 S.E. 2d 913 (1969); *accord, Wolfe v. North Carolina*, 364 U.S. 177, 4 L.Ed. 2d 1650, 80 S.Ct. 1482 (1960). Such is not the case here. The indictments are proper in form and nothing appears upon the face of either indicating that it will not support a judgment.

[8] By assignments of error numbers 46 and 47, defendant attempts to assign error to the admission of Massey's testimony at trial. In our opinion, neither defendant's right to due process nor his right to confrontation was violated by the admission of Massey's statement.

Our holding in *State v. Montgomery*, 291 N.C. 235, 229 S.E. 2d 904 (1976), squarely answers defendant's contention regarding Massey's allegedly coerced statements. There we said:

It is self evident that a denial of due process occurs when the State contrives a conviction by the knowing use of perjured testimony. However, when a witness testifies as to facts earlier obtained by coercive police action and all of the circumstances surrounding the alleged coercive acts are before the jury, the requirements of due process are met. It is then for the jury to determine the weight, if any, to be given to the testimony. (Citations omitted.)

*   *   *

Evidence of any police coercion or of contradictory statements and withholding of information on the part of the witnesses goes to their credibility. This, of course, is a jury question.

*Id.* at 240-41, 229 S.E. 2d at 907-08.

Evidence of any police coercion in obtaining Massey's statement went to the credibility of the witness, which was a jury question. The force of defendant's argument on this assignment of error is further diluted by failure of counsel to pursue the judge's permission to take the matter to another judge for ruling. Therefore, neither the statements to police nor the trial testimony. complained of here violated defendant's right of due process and the testimony of the witness Massey was admissible.

[9] Neither do we find any merit in defendant's contention that he was denied his constitutional right of confrontation because the witness Massey refused to testify at the pretrial voir dire concerning the alleged inculpatory statements made by her to police officers. At the time of the pretrial voir dire hearing, Massey was a co-defendant charged with the same crime as defendant. She exercised her fifth amendment guarantee against self-incrimination, and the trial judge properly sustained her objection to giving testimony at this hearing. The charges against her were later dropped, and at the time Massey was called as a witness at defendant's trial, she was no longer a co-defendant. At trial defense counsel extensively cross-examined the witness Massey, and therefore defendant is in no position to complain that he was denied his constitutional right to confront a witness who testified against him.

[10] Defendant attacks the constitutionality of the death statute contending that it is discriminatory and constitutes cruel and

unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution. He further argues that the statute impermissibly extends the court's jurisdiction without a constitutional amendment in violation of Article IV, Section 12, of the North Carolina Constitution. This Court rejected a contention that our death penalty statute is unconstitutional on the ground that it constituted cruel and unusual punishment in *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, 100 S.Ct. 3050, *reh. denied*, 448 U.S. 918, 65 L.Ed. 2d 1181, 101 S.Ct. 41 (1980). Even so, defendant now contends that the statute is unconstitutional because it is discriminatory in that its provisions result in a differential treatment of minorities. We reject this argument. The very contention that defendant here advances is one of the principal precipitating factors that caused the General Assembly to adopt our present death statute. It is drafted and implemented so as to preclude the arbitrary and capricious imposition of the death penalty upon any segment of the state's population.

Defendant's challenge to G.S. 15A-2000(d) as an impermissible expansion of this Court's jurisdiction is groundless. *Smith v. State*, 289 N.C. 303, 222 S.E. 2d 412 (1976), recognizes that this Court's jurisdiction is limited "to review upon appeal any decision of the court below upon any matter of law or legal inference" as allowed by Article IV, Section 12, Constitution of North Carolina. G.S. 15A-2000(d) provides by way of review of judgment and sentence that:

    (1) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of North Carolina pursuant to procedures established by the Rules of Appellate Procedure. In its review, the Supreme Court shall consider the punishment imposed as well as any errors assigned on appeal.

    (2) The sentence of death shall be overturned and a sentence of life imprisonment imposed in lieu thereof by the Supreme Court upon a finding that the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, or upon a finding that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, or upon

a finding that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The Supreme Court may suspend consideration of death penalty cases until such time as the court determines it is prepared to make the comparisons required under the provisions of this section.

(3) If the sentence of death and the judgment of the trial court are reversed on appeal for error in the post-verdict sentencing proceeding, the Supreme Court shall order that a new sentencing hearing be conducted in conformity with the procedures of this Article.

Further, the above-quoted provisions of the statute destroy defendant's contention that there are no standards and guidelines for review of the death sentence by this Court.

We hold that the North Carolina capital punishment statute is constitutional.

[11] Defendant avers that the trial court erred in denying his motion for a bill of particulars pursuant to G.S. 15A-925.

G.S. 15A-925 provides *inter alia* that:

(b) A motion for a bill of particulars must request and specify items of factual information desired by the defendant which pertain to the charge and which are not recited in the pleading, and must allege that the defendant cannot adequately prepare or conduct his defense without such information.

(c) If any or all of the items of information requested are necessary to enable the defendant adequately to prepare or conduct his defense, the court must order the State to file and serve a bill of particulars. Nothing contained in this section authorizes an order for a bill of particulars which requires the State to recite matters of evidence.

Defendant's motion for a bill of particulars requested the following information:

a) The exact floor plan and location of floor displays of the 7-11 Store when the alleged shooting occurred.

b) The position of the purported victim of the shooting within the 7-11 Store at all times before and after the shooting.

c) The size of windows in the front of said 7-11 Store, plus any and all decorations, lettering or signs and displays mounted on and in said window.

d) The size and pattern of marked parking spaces in the parking lot of said 7-11 Store and where each automobile or automobiles were at the time of the alleged shooting.

e) The alleged positions of each of the four named defendants and the alleged paths each traveled during the entire duration of the time they allegedly were present at the 7-11 Store with particular emphasis on the exact positions of the four named defendants with respect to each other and to the victim at the time of the actual shooting incident.

In *State v. Detter*, 298 N.C. 604, 260 S.E. 2d 567 (1979), we reiterated the well established rule that:

The function of such a bill of particulars is (1) to inform the defense of the specific occurrences intended to be investigated on the trial and (2) to limit the course of the evidence to the particular scope of inquiry. [Citations omitted.]

The granting or denial of motions for a bill of particulars is within the discretion of the court and is not subject to review except for palpable and gross abuse thereof. [Citations omitted.]

*Id.* at 611, 260 S.E. 2d at 574.

In this case, defendant's motion for a bill of particulars requested some matters which were capable of being ascertained by viewing the murder scene. Such information was discoverable under G.S. 15A-901, *et seq.* The record in the case before us is silent concerning how much, if any, of this type evidence defendant sought to obtain through discovery.

Defendant's request also sought information concerning the paths that each of the defendants traveled within the store during the robbery and the position of the victim within the Seven-Eleven at all times before and after the shooting. This lat-

ter information is clearly beyond the scope of G.S. 15A-925(c) since it requests "matters of evidence."

Further an examination of defendant's pretrial motions reveals a keen understanding of the charges against him and the factual bases therefor. The trial court correctly denied defendant's motion for a bill of particulars.

[12] Defendant next assigns error to the trial court's refusal to grant his motion for one judge to retain jurisdiction of the case throughout its pendency both during the pretrial stage and at trial. Defendant cites no authority for this proposition and opines only that our system of rotating Superior Court Judges somehow denies him due process of law.

Our system of Superior Court Judge rotation is embodied in our state constitution (Article IV, § 11) and makes it likely that more than one Superior Court Judge might rule on motions in a lengthy, protracted trial such as the one here.

Article IV, Section 11, of the North Carolina Constitution has been examined by the federal courts and found to be constitutionally sound. *Holshouser v. Scott*, 335 F. Supp. 928 (M.D. N.C. 1971), *aff'd*, 409 U.S. 807, 34 L.Ed. 2d 68, 93 S.Ct. 43 (1972), held *inter alia* that the provision of our state constitution requiring that the State be divided into divisions and districts and the judges rotated among the districts was valid.

Defendant failed to demonstrate error or show prejudice because more than one Superior Court Judge took part in the pretrial proceedings. We discern no prejudice to defendant in the denial of this motion.

[13] Defendant next contends that the trial court erred when it refused to release him from custody in order that he might seek out alibi witnesses.

Defendant argues that because of his continuous incarceration without bond in Gaston and Cabarrus Counties from the date of his arrest through trial he was unable to locate alibi witnesses in Mecklenburg County. Defendant asserts that the necessity to gain his release to seek alibi witnesses was compounded by the fact that although he did not know the names of his witnesses he could recognize them upon sight. Defendant graciously suggested that a sheriff's deputy might be detailed to accompany him into

Mecklenburg County in search of his elusive witnesses. We note that there were no supporting affidavits or documentation which would have indicated to the trial court that there was even a possibility that such witnesses existed, or that efforts had been made to locate such witnesses without success. Defendant's primary defense was that of alibi. He claimed to have been in Charlotte with his wife and three children on Saturday, 2 June 1979, and Sunday morning, 3 June 1979. Defendant's wife, his sister, and his sister-in-law gave testimony which tended to corroborate defendant's alibi testimony.

Defendant's assignment of error can be likened to a request for continuance based upon the absence of a witness. Such a request is within the sound discretion of the trial court, and absent a showing of abuse of such discretion, the ruling must stand. *E.g.*, *State v. Tolley*, 290 N.C. 349, 226 S.E. 2d 353 (1976). No abuse of discretion is shown.

[14] Defendant assigns as error the denial of numerous additional pretrial motions. Apart from inclusion of the motions themselves, no reference to them occurs elsewhere in the record or in the exhibits, except for the following "Entry of Exceptions" wherein defendant alleges:

That on January 7, 1980, the Court heard motions of the defendant, Larry Darnell Williams, and after hearing arguments of Counsel, the Court denied motions as follows:

#19 Motion to Prohibit Jury Dispersal.

#24 Motion for Individual Voir Dire and Sequestration of Jurors During Voir Dire.

#25 Motion to Limit Disqualification for Particular Juror Views on Punishment.

#28 Motion to Allow Defendant to Act as Co-counsel.

#32 Request for Instructions During Voir Dire.

#33 Motion to Disclose Aggravating Circumstances.

#34 Motion to Voir Dire Jury at End of Guilt Innocence Phase.

#38 Motion for Separate Trial Jury and Separate Punishment Jury.

#39 Motion for Two Separate Juries and No Death Qualification of the First Jury.

#40 Motion to Strike Jurors After Individual Voir Dire is Completed.

#41 Motion for Sequestration of the Jury During the Jury Trial.

#48 Motion to Regulate the Dress of Police Witnesses.

#50 Motion for Funds to Acquire Adequate Clothing.

#51 Motion to Reconsider Change of Venue or Special Venire.

#52 Motion to Limit Jury Inquiry.

#53 Supplement to Motion to Reconsider Change of Venue of Special Venire.

#54 Motion in Limine.

Exception No. 4

To the Courts ruling and the rendition thereof, the defendant excepts and gives notice of appeal.

Nowhere in the record does there appear an Order by the trial court denying these motions. Neither have we found any record of the proceedings which allegedly occurred on 7 January 1980 in which the motions are said to have been denied. While we have no doubt that the motions were indeed denied, we fail to see how we can review the action of a trial court when that action does not appear of record. App. R. 9(b)(3)(vii) (specifying that the record on appeal in criminal cases shall contain copies of "the judgment, order, or other determination from which appeal is taken"). *See also State v. McCain*, 39 N.C. App. 213, 249 S.E. 2d 812 (1978) (failure to include in record an order appealed from is a violation of App. R. 9(b)(3) ). Further, we have nothing before us to indicate the grounds presented for granting these motions, or upon what grounds they were denied. This Court is bound by the record before it, and in the absence of anything in the record to indicate otherwise, must assume that the trial judge ruled properly on matters before him, correctly applying the applicable law. *E.g., State v. Mullis*, 233 N.C. 542, 64 S.E. 2d 656 (1951). We do

not, however, dismiss the assignments of error without due consideration.

Upon close examination we discover that the motions designated numbers 51 and 52 are properly raised elsewhere in defendant's appeal and are considered under separate assignments of error. Other motions, numbers 28, 33, and 54, are closely related to properly raised assignments of error and are considered in the discussion accompanying these assignments.

Although defendant has failed properly to raise the remaining assignments of error, we elect because of the gravity of this case to examine these matters insofar as the information in the record permits. Our careful examination discloses no error in the denial of these motions.

As to defendant's remaining pretrial motions, first we find no merit in his argument that the trial judge erred when he denied defendant's motion for thirty days' notice of the jury pool prior to trial.

Initially we note that the judge ordered that defense counsel be furnished a copy of the jury list "immediately upon its availability." The record does not contain the jury *voir dire*, and we therefore cannot determine whether there was any possibility that defendant was forced to accept a prejudiced juror. Defendant cites no authority in support of this argument. Neither does he even argue that the ruling was prejudicial to him.

[15] Finally, defendant asserts that the court below erred in denying his motion to require the district attorney and his staff to disclose personal, business, social, church, and civic ties with prospective jurors. The recognized and proper way to inquire into such matters is on the jury *voir dire*. The record does not disclose whether potential jurors were questioned on these matters, neither does it contain any indication that the jurors failed to disclose ties with the State's attorney. Defendant cites no authority for this argument but informs this Court, "People have a natural dislike toward people speaking about such relationships on voir dire." This may or may not be, but defendant has failed to show either that the prospective jurors in instant case possessed such a dislike, or that he was prejudiced thereby.

We find no prejudicial error in the denial of any of defendant's pretrial motions.

## II. GUILT PHASE OF TRIAL

Defendant assigns as error several rulings by the trial court during the guilt-innocence phase of the trial.

[16] Defendant's assignment of error number 36 is as follows:

The court erred in allowing numerous leading questions by the district attorney.

We have examined all of the questions to which defendant excepts under this assignment of error. Five of these questions simply restated facts to which the witness had just testified without objection. For example, the witness Massey testified that "Larry Williams also stayed with me starting about Easter." Immediately thereafter the district attorney asked, "Ms. Massey, did he stay there off and on from Easter of 1979 and times forward?" Defendant objected, and the witness did not answer.

Later the witness Massey testified that defendant told her "to pull the car next to a booth in the center of the parking lot." The next question was, "Is that sort of in the middle of the parking lot?" There were three other exceptions to questions which followed this same pattern. There was exception to a question which was not answered and finally an exception to a question where the objection came after the answer was given and there was no motion to strike.

The vice in leading questions is that they embody a question which could be answered by a simple yes or no answer *and* suggest the answer desired. *State v. Peplinski*, 290 N.C. 236, 225 S.E. 2d 568, *cert. denied*, 429 U.S. 932, 50 L.Ed. 2d 301, 97 S.Ct. 339 (1976). The majority of the questions were not prejudicially leading since they suggested no facts which were not obviously a part of the witness's prior testimony. In the remaining question which elicited an answer, defense counsel failed to properly object or preserve his exceptions by a motion to strike. *See State v. Grace*, 287 N.C. 243, 213 S.E. 2d 717 (1975). Further, we find nothing in the content of the challenged questions or answers which added strength to the State's case. At best the questions were merely introductory or calculated to elicit the truth. *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974). At worst they were nonconsequential and repetitive questions which added nothing to the case.

A presiding judge has wide discretion in permitting or restricting leading questions, and his ruling will not be disturbed when the evidence is otherwise competent, absent a showing of abuse of discretion. *State v. Brunson,* 287 N.C. 436, 215 S.E. 2d 94 (1975). Here no abuse of discretion was shown, and the trial judge correctly admitted this otherwise competent evidence.

[17] Defendant assigns as error the overruling of an objection to a question which defendant characterizes as an attempt by the State to impeach its own witness. The question came after the District Attorney had inquired into several statements made by the witness to the effect that she did not believe defendant had committed the murder. The District Attorney continued:

Q. Ms. Massey, were you saying that you were uncertain that he was the man that walked in the store with the gun?

MR. MEDLIN: OBJECTION. He is impeaching his own witness, Your Honor.

COURT: OVERRULED. Answer the question.

EXCEPTION NO. 16

A. No, I am not saying that I an unsure that he was with me. In other words, I was just saying that I hoped that he wasn't the one that did it.

Q. Did what, ma'am?

A. The murder.

Q. You mean the one that actually fired the shot?

A. Yes, sir.

Obviously the purpose of this question was not to discredit the witness's testimony but merely to clarify the fact that her doubts were directed not to defendant's involvement in the shooting but to the question of whether defendant was the one who actually pulled the trigger. While the State ordinarily may not impeach its own witness, *State v. Anderson,* 283 N.C. 218, 195 S.E. 2d 561 (1973), this Court has approved efforts by the State directed to clearing up confusion as to a witness's statements, *State v. Berry,* 295 N.C. 534, 246 S.E. 2d 758 (1978).

The trial judge properly overruled defendant's objection.

Defendant assigns error to the admission of rebuttal testimony by a police detective who interviewed defendant about the Gastonia killing. Defendant argues that the testimony related only to the Gastonia incident and had no tendency to rebut the evidence of defendant concerning the Concord killing. We disagree. The portion of the witness's testimony to which defendant excepts tended to show that during his interrogation about the Gastonia killing, the defendant stated that he spent the night of 2 June and the morning of 3 June 1979 with Linda Massey and a fourteen-year-old boy smoking reefers (marijuana) and drinking wine. This statement was in direct contradiction to defendant's statement at trial that he spent that night at his wife's house in Charlotte and was clearly admissible for the purpose of impeachment as a prior inconsistent statement on a material matter. *E. g.,* *State v. Green,* 296 N.C. 183, 250 S.E. 2d 197 (1978). We note that defendant failed to request a limiting instruction regarding this testimony.

This assignment of error is likewise without merit.

The defendant assigns error to the denial of his motions to dismiss, and to set aside the verdict and order a new trial, and to the entry of judgment. All of these motions are directed to the sufficiency of the evidence. *See, e.g., State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980); *State v. Roberts,* 293 N.C. 1, 235 S.E. 2d 203 (1977).

These assignments of error appear to be formal. However, we note that there was ample substantial evidence in this record of each essential element of first-degree felony murder and that defendant was the perpetrator of that crime. *State v. Mason,* 279 N.C. 435, 183 S.E. 2d 661 (1971).

The trial judge correctly denied each of these motions.

By assignments of error numbers 40 and 41, defendant contends that the trial judge erred in his charge to the jury in both the guilt-innocence phase and the sentencing phase of the trial.

This record discloses that defendant has not entered a single exception to the trial judge's charge. This Court will not ordinarily review questions of law or legal inference when not supported by exceptions duly entered in the court below and brought for-

ward in the briefs. *State v. Taylor*, 240 N.C. 117, 80 S.E. 2d 917 (1954).

Apparently defendant was attempting to allege that it was error to charge the jury at all because his motions to dismiss, to set aside the verdict, and for a new trial were erroneously denied by the trial judge.

We have previously discussed defendant's motions to dismiss, to set aside the verdict, and for a new trial.

Although these assignments of error are not properly before us, we have nevertheless carefully considered this entire charge and find no error as it relates to the guilt-innocence phase of the trial. Any error in the charge relating to the sentencing phase of the trial will be hereinafter considered.

We find no error in the guilt determination phase of defendant's trial.

### III. SENTENCING PHASE OF TRIAL

[18] Defendant assigns error to the form of the indictment presented against him for its failure to indicate what aggravating circumstance(s) the State would attempt to show to invoke the death penalty during the sentencing phase of trial. He asserts that failure to so inform him is violative of the constitutional guarantee of due process. He argues that unless at least one aggravating circumstance which will support the death penalty is set forth in the indictment that it cannot support a judgment imposing the death penalty.

The indictment reads as follows:

THE JURORS FOR THE STATE UPON THEIR OATH DO PRESENT, That Larry Darnell Williams late of the County of Cabarrus on the 3rd day of June 1979, with force and arms, at and in the said County, feloniously, wilfully, and of his malice aforethought, did kill and murder Susan Hicks Pierce contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

This indictment complies with the short form indictment authorized by G.S. 15-144 which requires that:

In indictments for murder and manslaughter, it is not necessary to allege matter not required to be proved on the trial; but in the body of the indictment, after naming the per-

son accused, and the county of his residence, the date of the offense, the averment "with force and arms," and the county of the alleged commission of the offense, as is now usual, it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law; and it is sufficient in describing manslaughter to allege that the accused feloniously and willfully did kill and slay (naming the person killed), and concluding as aforesaid; and any bill of indictment containing the averments and allegations herein named shall be good and sufficient in law as an indictment for murder or manslaughter, as the case may be.

In *State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, 434 U.S. 928, 54 L.Ed. 2d 288, 98 S.Ct. 414 (1977), we said that:

In numerous cases, this Court has held that an indictment drawn in accordance with G.S. 15-144 is sufficient to sustain a verdict of guilty of murder in the first degree based upon a finding that defendant killed with malice, premeditation and deliberation, or that defendant killed in the perpetration or attempted perpetration of any arson, rape, robbery, burglary or other felony. (Citations omitted.) If defendant had deemed it necessary, he could have moved for a bill of particulars to ascertain the theory which the State intended to rely upon at trial. (Citations omitted.)

*Id.* at 661, 235 S.E. 2d at 189.

On 2 October 1979, defendant was arraigned in the Superior Court of Cabarrus County on charges of murder in the first degree.

G.S. 15A-2000(a)(1) and (b) inform any criminal defendant charged with a capital offense that a separate proceeding on the issue of penalty will be convened following conviction or adjudication of guilt in a capital felony wherein the jury will be instructed that it must consider any aggravating circumstance(s) or mitigating circumstance(s) from the lists provided by G.S. 15A-2000(e) and (f), respectively.

Defendant cites no statutory or case law which requires an indictment in a death case to list the aggravating circumstances

upon which the State will rely in seeking the death penalty. Nor does he contend that he was prejudiced because of lack of actual notice of the aggravating circumstances the State would rely upon. The thrust of defendant's argument is that, since an indictment will not support a conviction of an offense more serious than is charged in the indictment, an indictment must allege at least one aggravating circumstance to support a judgment imposing a death penalty. We do not agree. Here the indictment charged first-degree murder, and defendant was duly arraigned upon that charge, it being the only felony for which the death penalty may be imposed in North Carolina. G.S. 14-17. G.S. 15A, Article 100, does not create a new offense or add new elements to the crime of first-degree murder. The statutes merely set forth sentencing standards to guide the jury's discretion to the end that the death penalty will not be imposed arbitrarily or capriciously.

G.S. 15A-2000(e) sets forth eleven aggravating circumstances which may be considered by the jury. Therefore, defendant was apprised of the aggravating circumstance or circumstances that the State must prove before the death penalty could be imposed. *See Spinkellink v. Wainwright*, 578 F. 2d 582 (5th Cir. 1978); *State v. Berry*, 592 S.W. 2d 553 (Tenn. 1980); *Andrews v. Morris*, 607 P. 2d 816 (Utah 1980).

We hold that the indictment met the due process requirement of the United States Constitution, met the requirements of the North Carolina Constitution, and properly activated the provisions of G.S. 15A-2000 *et seq.*

[19] Defendant assigns as error the denial of his motion *in limine* and the subsequent admission at the guilt-innocence phase and the sentencing phase of the trial of evidence concerning a crime committed in Gaston County. By these assignments, he challenges the evidence tending to show that he and another robbed and killed Eric Joines at the Service Distributing Company in Gastonia, just hours prior to robbing and killing Susan Pierce at the Seven-Eleven store on North Church Street in Concord shortly after 6:00 a.m. on 3 June 1979. Defendant contends that the evidence of the Gastonia robbery and murder is unrelated, irrelevant, and prejudicial to his trial.

The landmark case of *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954), *inter alia*, holds that the State cannot offer evidence

of other crimes committed by the defendant where the only relevancy of such evidence is its tendency to show the defendant's disposition to commit a crime of the nature of the one for which he is on trial. However, there are numerous exceptions to this general rule which include evidence of identity and intent. *Accord, State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796, 100 S.Ct. 2165 (1980); *State v. Barfield, supra; State v. May, supra; State v. Williams*, 292 N.C. 391, 233 S.E. 2d 507 (1977). In *Williams* this Court approved the admission of evidence of an armed robbery and murder occurring shortly before the felony murder therein charged for the purpose of showing intent. Likewise, in *May* we approved admission of evidence tending to show defendant's participation in an armed robbery of a dry cleaning business five days earlier in which defendant used the same sawed-off shotgun he had used in the robbery for which he stood charged. This evidence was admitted to show defendant's intent and *quo animo*.

Here the evidence shows that defendant left Charlotte with his accomplices to commit armed robbery. Darryl Brawley's testimony was that, "I handed (defendant) the shotgun shells . . . (defendant) put one shell in the shotgun . . . and said 'Let's go to Concord or Gastonia and make some money.'" The evidence shows that the manner in which Joines was robbed and killed with a shotgun blast in Gastonia established the same *modus operandi* as was used in the killing of Pierce in the case before us.

The evidence further reveals that defendant attempted to establish an alibi by testifying that he remained overnight with his wife in Charlotte on the night of 2 June and the morning of 3 June 1979 and offered several witnesses to corroborate his testimony in this regard. Thus the question of identity was raised.

We hold that the trial judge correctly admitted the evidence of the Gastonia crime to show intent and identity. In our opinion, the evidence was sufficient to permit the admission of this evidence on the ground of other exceptions to the McClain rule; however, we need not discuss those other exceptions since the trial judge limited the use of this testimony to the showing of intent and identity.

[20]   Defendant contends that the trial court erred in submitting the aggravating circumstance that "the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." G.S. 15A-2000(e)(4). The jury found this to be one of the aggravating circumstances.

The challenged aggravating circumstance was submitted on the theory that Susan Pierce was killed in order to eliminate her as a witness who could later identify the perpetrators of the armed robbery.

In *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), we held that the isolated fact that a killing occurred during the commission of a felony is not sufficient to justify the submission of the aggravating circumstance set out in G.S. 15A-2000(e)(4). We there stated and now reiterate that there must be evidence from which the jury could infer that at least one of the purposes which motivated the killing was defendant's desire to avoid or prevent a lawful arrest or effect an escape.

Justice Britt, for the majority in *Goodman*, wrote:

This provision, on its face, is unambiguous, but it must also be construed properly so that instructions on this aggravating circumstance will only be given the jury in appropriate cases. In a broad sense every murder silences the victim, thus having the effect of aiding the criminal in the avoidance or prevention of his arrest. It is not accurate to say, however, that in every case this "purpose" motivates the killing.

298 N.C. at 26, 257 S.E. 2d at 586.

*Goodman* carefully analyzed the Florida case of *Riley v. State*, 366 So. 2d 19 (Fla. 1979). Obviously this case was chosen for analysis because of the similarities between the death statutes in the respective states and the similarity of the aggravating circumstances involved in the two cases. In *Riley* the Florida court concluded that "proof of the requisite intent to avoid arrest and detection must be very strong. . . ." *Goodman*, 298 N.C. at 27, 257 S.E. 2d at 586.

Although in *Goodman* we did not adopt the *burden* of proof required by the Florida court, we concluded:

Before the trial court can instruct the jury on this aggravating circumstance there must be evidence from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime. We repeat that "the mere fact of a death is not enough to invoke this factor."

*Id.*

In the case before us, we do not find that there is sufficient evidence from which a jury could reasonably infer such a motivating factor in the killing. The defendant's statement, as related by the witness Massey, to the effect that defendant wanted to leave the Seven-Eleven parking lot at a slow rate of speed so as not to attract attention does not support such an inference. This single statement by the defendant occurred after the killing and at that point it was extremely likely that the statement reflected defendant's wish to avoid detection for the killing. However, such a statement cannot raise a reasonable inference as to his motivation before or at the time of the killing. It is a post-killing expression evidencing an after-the-fact desire not to be detected or apprehended. In our opinion, it does not raise a reasonable inference that at the time of the killing defendant killed for the purpose of avoiding lawful arrest. Therefore, the challenged aggravating circumstance should not have been submitted to the jury.

We turn to the question of whether the error in submitting this aggravating circumstance was so prejudicial as to warrant a new trial on the sentencing phase of the case.

The test for harmless error is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *State v. Thacker*, 281 N.C. 447, 189 S.E. 2d 145 (1972).

In our consideration of the harmless error test in *Goodman* we stated:

We believe a similar test should be applied when one of the aggravating circumstances listed in G.S. 15A-2000(e) is erroneously submitted by the court and answered by the jury against the defendant. It follows that in cases coming before

us presenting this question we must answer the question based on the evidence in the particular case.

Of course, we have no way of *knowing* if submission of the erroneous issue in the case at hand tipped the scales in favor of the jury finding that the aggravating circumstances were "sufficiently substantial" to justify imposition of the death penalty. (Emphasis in original.)

298 N.C. at 29, 257 S.E. 2d at 587.

Here the jury answered issues submitted on three aggravating circumstances against defendant and one or more of seven mitigating circumstances in his favor. Due to the potential imbalance between aggravating circumstances and mitigating circumstances in this case, it is reasonably possible that the submission of the erroneous issue may have tipped the balance in favor of the death sentence. We therefore hold that the erroneous submission of this aggravating circumstance was prejudicial since we cannot say that there was not a reasonable possibility that its submission might have contributed to defendant's conviction.

We do not reach defendant's contention that the court should review the sentence in this case to determine if the sentence was disproportionate to the sentences imposed in similar cases, since "this review function should be employed only in cases where both phases of the trial of a defendant have been found to be without error." *Goodman,* 298 N.C. at 35, 257 S.E. 2d at 591. Neither do we deem it necessary to consider the remaining assignments of error relating to the sentencing phase of the trial since we find some of them to be without merit while others have been previously answered by this Court. *See e.g. State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981) (regarding form of the verdict sheet enumerating the mitigating circumstances). In our opinion, the remaining errors assigned will most likely not recur at the new sentencing trial.

We likewise do not reach defendant's assignment of error to the exclusion for cause from the jury of a venireman who expressed opposition to the death penalty since his exclusion from the jury panel is moot in light of our decision on the sentencing phase of the trial.

For the reasons stated, the verdict rendered in the sentencing phase of defendant's trial and the judgment of death imposed

thereon are vacated, and this cause is remanded to the Superior Court of Cabarrus County for a new trial on the sentencing phase.

New trial on sentencing phase.

No error in guilt phase.